# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LOCAL 67, OPERATIVE PLASTERERS AND
CEMENT MASONS' INTERNATIONAL
ASSOCIATION, AFL-CIO,
                    Plaintiff,

                                        Case Number:  04-CV-73022-DT

                                        JUDGE PAUL D. BORMAN
            vs.                         MAGISTRATE JUDGE STEVEN PEPE

GEM MANAGEMENT COMPANY, INC.,
                    Defendant
_____/

GEM MANAGEMENT COMPANY, INC.,
                    Third-Party Plaintiff

            vs.

BRICKLAYERS & ALLIED CRAFTWORKERS
LOCAL 9, AFL-CIO
                    Third-Party Defendant
_____/


## REPORT AND RECOMMENDATION
## GRANTING
Third-Party Defendant Bricklayers 9's
Motion to Dismiss Complaint and Stay Discovery (Dkt. #16)

### &
## OPINION AND ORDER DENYING
Third Party Defendant Bricklayers  9's Motion to Set Aside June 29, 2005 Order (Dkt. # 19)
Third Party Defendant Bricklayers 9's Motion for Sanctions (Dkt. # 23)
Defendant GEM's Motion to Amend Third-Party Complaint   (Dkt. # 31)
Defendant GEM's Motion to Join Parties (Pension Funds)  (Dkt. # 32)
Defendant GEM's Motion to Strike Bricklayers  9's Reply Brief (Dkt. # 45)
Third-Party Defendant Bricklayers 9's Motion to Strike GEM's Second Supplemental Brief
(Dkt. # 53)


## AND GRANTING
Defendant GEM's Motion  to Extend Dates  (Dkt. # 37)

The numerous motions noted above have been referred pursuant to 28 U.S.C. § 636 (b)(1)(A) for a hearing and determination.  A telephonic hearing was held on August 23, 2005, and was followed by a request to the parties for briefing on the issue of exhaustion of grievance remedies in a collective bargaining agreement.  Because Third-Party Defendant Bricklayers 9's Motion to Dismiss Complaint and Stay Discovery (Dkt. #16) is case dispositive on an existing complaint presently before the Court, that motion is being handled under 28 U.S.C. § 636 (b)(1)(B).  For reasons noted below, it is recommended that Third-Party Defendant Bricklayers 9's Motion to Dismiss Complaint and Stay Discovery (Dkt. #16) be granted for Defendant Third-Party Plaintiff's failure to exhaust mandatory grievance proceedings under the collective bargaining agreement with the Third-Party Defendant or demonstrate why this Court should disregard its agreed upon means for dispute resolution.  It is further ordered that Third-Party Defendant Bricklayers 9 's motions to Set Aside the June 29, 2005 Order (Dkt. # 19), for Sanctions (Dkt. # 23), and to Strike GEM's Second Supplemental Brief (Dkt. # 53), and Defendant GEM's motions to Amend Third-Party Complaint (Dkt. # 31), to Join Parties (Pension Funds) (Dkt. # 32), to Strike Bricklayers 9's Reply Brief (Dkt. # 45) be denied and its Motion to  Extend Dates (Dkt. # 37) granted.

## I. BACKGROUND FACTS

Defendant Gem Management Company, Inc. ("GEM ") is a Michigan corporation located in Clare, Michigan, that is engaged in the business of synthetic-plaster installation throughout Michigan.   On February 9, 1999, GEM entered into a collective bargaining agreement ("CBA") with  Bricklayers & Allied Craftworkers Local  9, AFL-CIO, ("Bricklayers  9"), located in Saginaw, Michigan,  that designates Bricklayers  9's work jurisdiction as the entire State of

Michigan, with the exception of Wayne, Oakland, Macomb, and Monroe counties.

On October 2, 1999, GEM entered into a standard, multi-employer CBA with Plaintiff, Plasterers 67, Operative Plasterers and Cement Masons International Association, AFL-CIO ("Plasterers 67"), which agreement ("Plasterers 67's CBA") identified Plasterers 67's work jurisdiction as Wayne, Macomb, Oakland, and Monroe counties south of 13 Mile Road in Michigan. This CBA was a "me too" agreement binding GEM to a 1997-2000 CBA between Plasterers 67 and the Detroit Association of Wall and Ceiling Contractors later known as the Architectural Contractors Trade Association (ACT) (the "1997 ACT agreement"). Plasterers 67 claims that GEM thereafter became bound by a 2000-2003 successor agreement to Plasterers 67's 1997 ACT agreement (the "2000 ACT agreement"). This 2000 ACT agreement expands Plasterers 67's work jurisdiction to include all of Wayne, Oakland, Macomb, Lapeer, and St. Clair Counties in Michigan. Thus, the work jurisdictions for doing GEM's synthetic plaster installation work in Bricklayers 9's and Plasterers 67's CBAs overlapped as to Lapeer and St. Clair counties in Michigan. GEM denies that it is bound by the 2000 Act agreement and contends it terminated the 1997 ACT agreement as of March 7, 2003.

Both Bricklayers 9's and Plasterers 67's CBAs required GEM to pay wage and fringe-benefit contributions to each union's fringe benefit funds based upon employee work hours and to provide fringe benefits to employees. Thus, depending upon the jurisdiction in which it worked, GEM was to make the requisite fringe-benefit contributions to Bricklayers 9 or to Plasterers 67, and in Lapeer and St. Clair Counties both unions claim fringe-benefit contributions. Over the years in dispute, GEM paid contributions for work done in these two counties to Bricklayers 9's fringe-benefit funds through The Trustees of the Michigan

3

Bricklayers 9 Fringe Benefit Funds whom it now seeks to add as a third-party defendant.

On October 21, 2001, Plasterers 67 filed an action against GEM before the National Labor Relations Board ("NLRB"), alleging that GEM committed an unfair labor practice in violation of the National Labor Relations Act ("the NLRA"), 29 U.S.C. § 151, *et seq.*, when it failed to pay wages and fringe-benefit contributions under Plasterers 67's CBA. After conducting a hearing on this claim, the NLRB's Administrative Law Judge Eric M. Fine ("ALJ") found that GEM was bound to Plasterers 67's 1997 ACT agreement and its successor 2000 ACT agreement and had failed to pay wages and fringe benefits in compliance with that CBA as to work performed within Lapeer County. *Gem Management Company, Inc.*, 339 NLRB No. 71, (2003). This decision was upheld by NLRB and the Sixth Circuit Court of Appeals. *Id.* and *N.L.R.B. v. Gem Management Co.*, 107 Fed.Appx. 576, (6th Cir. 2004). The Court in its August 19, 2004, order enjoined GEM from "[w]ithdrawing recognition from Local 67, Operative Plasterers' and Cement Masons' International Association, AFL-CIO (Plasterers 67) during the term of the collective-bargaining agreement between Plasterers 67 and Architectural Contractors Association (ACT), with effective dates of June 1, 2000, through May 31, 2003, (the 2000 ACT agreement)" and ordered payment of fringe-benefits and union dues to Plasterer 67 and its fringe-benefit funds for employees doing work in the jurisdiction.

Bricklayers' and Allied Craftsworkers' Local Union No. 1, International Union of Bricklayers and Allied Craftsworkers, AFL-CIO ("Bricklayers 1") and Bricklayers 9 were each named as parties at interest in the complaint. Neither Bricklayers 1 or Bricklayers 9 appeared in these NLRB proceedings. GEM did participate in the administrative hearing of the NLRB, but as noted by the Sixth Circuit, because "it did not file exceptions with the Board from the ALJ's

decision" it could not challenge the enforcement action before the Sixth Circuit. *Id.* Indeed GEM conceded "the Board's entitlement to summary enforcement but reserving a right to challenge the amount of monetary remedies . . . ." *Id.*

ALJ Fine's findings provide a significantly clearer background to this dispute than the pleadings currently do and unless challenged by either party, this Court can take judicial notice of these adjudicative facts under Fed. R. Evid. 201.[1] They are summarized in Appendix A to this opinion and Appendix A is herein incorporated by reference. Judicial notice is taken of the findings of fact in Appendix A, except for the ALJ finding that GEM is bound by the 2000 ACT agreement and his related finding that Gem's March 12, 2002, letter to Plasterers 67 failed to terminate its collective bargaining agreement with Plasterers 67. Defendant/Counter Plaintiff GEM contends in this litigation that its bargaining agreement with Plasterers 67 expired on March 7, 2003.[2] GEM submissions do not indicated that any other of the facts in ALJ Fine's decision – many objectively demonstrated in written documents and by maps – are being contested, though as noted, GEM can still do so in its objections to this report, recommendation and opinion.

According to Plasterers 67, GEM has failed to comply with the NLRB's decision and

---

[1] *Lee Distrib. v. NLRB*, 145 F.3d 834, 841 n. 5 (6th Cir. 1998). "Pursuant to Fed. R. Evid. 201, we have held that it is appropriate to take judicial notice of 'adjudicative facts' such as agency and judicial decisions, even where those decisions contain disputed statements of fact, as long as we take judicial notice for some purpose other than to take a position on the disputed fact issue. *See, e.g., United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993). Under Rule 201 (e) either party may challenge any of these asserted adjudicative facts in objections to this opinion.

[2] It is unclear why this date is asserted because both the 1997 and 2000 ACT agreements had expiration dates of May 31, 2000 and 2003 respectively that could be triggered by proper written notice being given 60-90 days before the expiration date. In the absence of such notice both agreements automatically renewed for one year unless superceded by a new agreement.

order by, among other things, failing to pay Plasterers 67's members the wages and fringe benefits to which Plasterers 67's CBA entitles them.  NLRB Compliance proceedings have not been concluded regarding any unpaid wages and fringe-benefit contributions due to Plasterers 67's fringe-benefits funds.

Under Article V of Plasterers 67's CBA, grievances between the employees and GEM are to be submitted to "final and binding" arbitration before the Joint Grievance Board ("JGB").  On May 4, 2004, Plasterers 67 filed a grievance before the JGB against GEM , alleging that GEM violated Plasterers 67's CBA by failing to pay certain back wages and fringe benefits and damages under that CBA.  After holding a hearing on the grievance on May 25, 2004, in which GEM did not participate, the JGB determined that GEM had violated Plasterers 67's CBA, and ordered GEM to remit to Plasterers 67 $342,324.98 for $208,973.19 in unpaid back wages, $117,071.55 in unpaid fringe benefits, and $5,853.38 in liquidated damages and $10,448.66 in interest.

GEM now claims that it declined to participate because (1) Plasterers 67 had already pursued an almost identical claim before the NLRB and (2) Plasterers 67 no longer had any work jurisdiction at the GEM work sites because the Plasterers 67's CBA ended on March 7, 2003. Thus no wages and fringe-benefit contributions could be due after this date.  GEM did not, however, assert these jurisdictional defenses before the JGB nor seek to have Bricklayers 9 joined as a party to those proceedings.  Nor, as noted in Appendix A, did it attempt to join Bricklayers 9 in the NLRB proceeding under 10(k).[3]  On June 2, 2004, the JGB sent a letter to

---

[3] "10(k)" refers to 29 U.S.C. § 160(k): Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph(4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute

GEM's owner and president, George Moore, demanding payment in compliance with its order

no later than July 2, 2004.  GEM did not comply with the JGB's June 2, 2004, request, and has

yet to pay the ordered award.

## II. PROCEDURAL HISTORY IN THIS COURT

On August 6, 2004, Plasterers 67 filed a single-count complaint in this Court against

GEM under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking

to enforce that decision by the JGB.  Plasterers 67 served GEM with the complaint on or about

August 6, 2004.   After this court denied GEM's  September 28, 2004, motion to dismiss under

Fed. R.Civ.P 12(h)(2) for failure to join Bricklayers 9 as an indispensable party under

F.R.Civ.P. 19 , it filed its answer on April 22, 2005, asserting that Plasterers 67's grievance was

filed after its 2000 ACT agreement with GEM was terminated, and thus the JGB had no

jurisdiction over GEM when it held its hearings and issued its decision on May 27, 2004.


On May 13, 2005, GEM filed a Third-Party complaint against Bricklayers 9.  GEM

alleges that both labor organizations' CBAs assert jurisdiction over the synthetic plaster

installation work performed in Lapeer and St. Clair counties, where GEM is located, and that if

GEM is required to pay the contested pension contributions to Plasterers 67, then Bricklayers 9

---

submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the
voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of
the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.
      As noted in Appendix A, GEM on November 30, 2001, initially wrote the NLRB asking for a
10(k) hearing to resolve a jurisdictional dispute regarding Macomb county –  specifically on 13-Mile
Road at I-94 –  where Plasterers 67 and Bricklayers 1 had conflicting CBA's.  Counsel for GEM
acknowledged that GEM did not file a formal unfair labor practice charge against Plasters or  pursue a
10(k) complaint. On this site referred to, GEM's president acknowledged at the administrative hearing
that he was using Bricklayer 9 workers, and not Bricklayers 1.  Bricklayers 9 had no CBA involving
Macomb county at that time.

should refund the money GEM paid Bricklayers 9 toward its pension fund, because only one labor organization can be entitled to collect pension contributions for the work that was done.[4] Bricklayers 9 alleges that GEM failed to defend itself at the GEM/Plasters  67 arbitration before the JGB and allowed a default judgment to be entered.

### III.  CURRENT MOTIONS

**Motion 1:   Bricklayers 9 Motion to Dismiss GEM's Third-Party Complaint and Stay Discovery** (Dkt. # 16)

On June 22, 2005, Bricklayers 9 filed a Motion to Dismiss Third-Party Complaint and Stay Discovery.   Bricklayers 9 cites Fed. R. Civ. P. 14(a) saying that a Third-Party complaint should be stricken because it was filed more than ten-days after the answer without seeking leave of court. (GEM's Answer was filed April 22, 2005, GEM's 3rd Party Complaint was filed May 13, 2005).  GEM responds that it filed a motion to dismiss Plasterers 67's complaint for failure to join Bricklayers 9, which was denied by the Court, and the parties resolved the issue by stipulating on the record that Bricklayers 9 would be joined and the Court agreed.  There is a March 2, 2005, minute entry on the docket entitled Parties Stipulated To Joinder.  Because it appears that Judge Borman agreed to the parties' seeking to join Bricklayer 9, thus informally providing "leave of court ," Bricklayers 9's motion to strike should not be granted based on this argument.

Bricklayers 9 argued in the alternative, that even if GEM's third-party complaint was timely, there is no substantive legal claim and it calls for a dismissal under Fed. R. Civ. P. 14(a) and 12(b)(6).  Bricklayers 9 alleges that GEM fails to state a claim because it fails to include a

---

[4] Both CBAs  contained provisions that require employers to make contributions to the labor organizations' fringe benefit funds based on the number of employee work hours used by the employer.

subject matter jurisdiction statement or a statement of the cause of action. Bricklayers 9 further states that because the NLRB found against GEM in the GEM/Plasters 67 matter, without bringing Bricklayers 9 in as a defendant, the whole award must be paid by GEM without contribution from Bricklayers 9. Bricklayers 9 argues that because it was not a party to the Plasterers 67/GEM contract it could not have breached that agreement and therefore cannot be held liable for damages resulting from GEM's breach of its CBA with Plasterers 67. Bricklayers 9 also argues that the fact that GEM might be held responsible for contributing to the fringe benefit funds of more than one union for the same work is GEM's own fault for signing multiple union contracts with at least three unions (Bricklayers 9, then Plasters 67 and then Bricklayers 1).

Bricklayers 9 argues further that the NLRB has exclusive jurisdiction over any dispute GEM has with the fact that Bricklayers 9 and Plasterers 67 each claim jurisdiction over St. Clair and Lapeer counties, and asserts that GEM should have filed a "10(k)"[5] charge to invoke the "jurisdictional dispute process" of the NLRB, and that its failure to do so does not allow it to bypass the NLRB and ask the court to require Bricklayers 9 to contribute to the Plasterers 67 arbitration award.[6]

---

[5] 10(k) refers to 29 USC § 160(k): Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph(4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

[6] Bricklayers 9 points out that the NLRB ALJ noted in the unfair labor practice decision, noted GEM's failure to invoke a 10(k) charge against Plasterers 67 and, therefore, disallowed the jurisdictional dispute as a defense in that matter. *Id.*

9

Bricklayers 9 also quotes Bricklayers 9's CBA which requires that the parties arbitrate disputes and a party must file a grievance within 10 days of any alleged violation of the CBA, Bricklayers 9 therefore argues that, at the latest, GEM could have brought a grievance against Bricklayers 9 for this issue ten days after the NLRB decision in the unfair labor practice charges against GEM.[7]

Bricklayers 9 also argues that any fringe-benefit contributions were not made to it, but rather to its pension funds and Bricklayers 9 cannot be used to force them to disgorge any funds.

Finally, Bricklayers 9 requests a stay of discovery.  GEM sent *subpoenas duces tucem*  to Michigan Bricklayers 9 Fringe Benefit Funds and its third-party administrator (TIC International), seeking documents regarding pension or payroll audits performed at GEM, Bricklayers 9 or OPMCIA.  Bricklayers 9 argues that this discovery should not be had because (a) the third-party complaint should be dismissed for reasons stated, (b) this matter involves only the review of an arbitrator's decision and therefore the court's jurisdiction is very limited, and (c) as stated before they could not return pension funds if they wanted to.

GEM responds to Bricklayers 9's motion to strike that a 10(k) hearing could only have been requested had an unfair labor practice been committed, i.e. if one of the unions had done something to coerce GEM into assigning work to a particular union, and nothing falling within

---

[7] The GEM/Bricklayers 9's  CBA relied on by GEM contains a grievance and arbitration provision in Article XVII, Section B that applies to both the union and employer:

> It is specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and conditions shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer, in writing, within ten (10) working days after the alleged violation is committed or discovered.

(Bricklayers 9 Reply Brief, Ex. A, pp. 12-13).

the statute's definition had occurred and adds that this court has jurisdiction to decide this matter under the Labor Management Relations Act, 29 U.S.C. § 301, because, GEM argues, this matter involves Bricklayers 9's breach of its CBA (GEM's brief in support of its response in opposition to Bricklayers 9's motion to strike, p. 16, Dkt. # 33).

**Analysis of Motion 1:**

**(A.)    Merits**

Here GEM has claimed in its Third-Party Complaint that Bricklayers 9 "account for all pension contributions in the jurisdiction at dispute in this case" and "disgorge" any GEM contributions to the Bricklayers 9 pension funds for any contributions for the same work for which GEM is found liable to the Plasterers 67's pension funds.  Bricklayers 9's motion to strike or to dismiss GEM's Third-Party Complaint deals solely with this complaint which deals with accounting for and disgorging fringe benefit payments made to the Bricklayers 9 pension funds under the GEM Bricklayers 9 CBA for work performed by Bricklayers 9 union members on GEM work sites.  Accordingly, it is related to the respective parties' rights and obligations under this CBA.  To the extent that GEM in its motion to amend and add parties seeks to make an indemnification and breach of CBA claim against Bricklayers and an unjust enrichment claim against the Bricklayers 9 Fringe Benefit Fund trustees, these portions of the motions will be treated as a separate request seeking to file third-party complaints under Fed. R. Civ. P. 14(a) and analyzed below.

There is ample authority holding that in a § 301 case such as this, federal courts have broad jurisdiction to deals with many types of controversies that arise between labor and

management.[8]  *Columbia Broadcasting System, Inc. v. American Recording & Broadcasting Ass'n*, 414 F.2d 1326, (2d Cir.1969).  In an ERISA case, the employer can defend against double paying benefits to two unions unless the pension fund can demonstrate that it is entitled to the fringe benefits and the contract anticipates such double payments.  *Trustees for Michigan Health Care Fund v. OCP*, 136 Fed.Appx. 849 (6th Cir. 2005).  Courts can, when appropriate, resolve the question themselves as in the *OCP* case.  Where there is a potential conflict between different union's claims to benefits, courts can step in an resolve the conflict to avoid the employer having to pay twice.  The court in that case found that the employer was not required to pay health premium benefits to a Michigan Bricklayers # 9 union for work done by Ohio Toledo Carpenters 886 union workers in Michigan, where these Ohio workers were the only workers on the Michigan job.  "In situations where an employer is exposed to conflicting CBAs that purport to impose a duty to "double pay" for the same job, the collecting trustee must show that the CBA created a contractual obligation for the employer to make contributions to both plans, even though only one union did the work."  *Id.* at 851, *construing B.A.C. Local 32 Insurance Fund v. Ohio Ceiling and Partition Company, Inc.*, 48 Fed. Appx.188, at 198*.*

If the matter is being pursued in an arbitration under a CBA by one union, federal courts can order joint arbitration of a labor dispute with another competing union.  *Columbia Broad. Sys., Inc., supra,* 414 F.2d at1327.  Courts also can order other unions to be added to litigation

---

[8]  In *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), for example, the Supreme Court upheld a ruling which compelled an employer to arbitrate with a union even though it had never entered into a contract with the union.

when necessary to avoid outcomes that conflict either with an NLRB jurisdictional determination or with arbitration rulings of the employer with other unions.  If a union refuses to comply with the order to add another union, its complaint against the employer can be dismissed.  *Window Glass Cutters League of America, AFL/CIO v. American St. Gobain Corp.*, 428 F.2d 353, 354-56 (3rd Cir. 1970).

Thus, an employer facing a double pay possibility has several options to attempt to avoid paying pension benefits to two unions' benefit funds for the same work.  The employer can seek to add the other union to the arbitration, and if that is refused, the employer can file a § 301 case and ask the court to join the other union and order joint arbitration.  If the union fails to do so, the court can dismiss the action if the case is a § 301 case brought by the union.  If it is a § 301 case brought by the employer seeking to add the other union, and then if the initial union or the arbitrator refuses to add the other union as the court orders, the court could later refuse to enforce any arbitration award.  Finally, in certain situations, to avoid inconsistent holdings, a court can add the other union and resolve the conflict itself, as was done in *Window Glass Cutters League* to assure that the health premiums need only be paid for the union members who did the actual work, and not the other union asserting jurisdiction and a claim for benefits over the same work.

Ordinarily, where there is a mandatory arbitration clause in a CBA, an employer or a union must exhaust these bargained-for grievance remedies before suing the other party in federal court. *United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry,*

13

*Local No. 577 v. Ross Bros.* Const. Co., 191 F.3d 714 (6th Cir. 1999).  It is well-settled in this

Circuit and nationally, that "a party must exhaust contractual grievance remedies before seeking

relief in federal court." *Wilson v. International Bhd. of Teamsters*, 83 F.3d 747, 752 (6th

Cir.1996). *Accord Clayton v. International Union*, 451 U.S. 679, 681, 101 S.Ct. 2088, 68

L.Ed.2d 538 (1981); *Durham v. Mason & Dixon Lines, Inc.*, 404 F.2d 864, 865 (6th Cir.1968).

Accordingly, if a party fails to pursue contractual grievance remedies, the party waives the right

to have its grievance settled in federal court. *See Durham*, 404 F.2d at 865. [9]

Yet, notwithstanding this strong presumption in favor of arbitration, courts have made

exceptions in cases where ordering arbitration might lead to inconsistent rulings on which of two

or more unions has jurisdiction or which of two unions is due benefits. Courts have adopted this

exception to the rule in favor of arbitration to avoid industrial strife between unions and avoid

putting an employer in a double-bind.

*International Ass'n of Machinists v. Howmet Corp.,* 466 F.2d 1249 (9th Cir. 1972),

involved a merger in which different unions represented employees at the buyer and seller

companies' plants.  The union of the seller's employees filed a federal court action to compel

---

[9]   The Supreme Court has established a strong presumption in favor of arbitration as the preferred method of settlement of industrial disputes. When the standard form of arbitration clause is used in a collective bargaining agreement, as it was here,  "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Co.,* 363 U.S. 574, 582-583 (1960) See also *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564 (1960),   and *United Steelworkers of America v. Enterprise Wheel & Car Co.,* 363 U.S. 593 (1960) (the "Steelworkers Trilogy").

arbitration of several grievances.  The buyer was bound by the seller's employees CBA at the seller's plants and another CBA at its old plants. Here the seller's employees tried to use its CBA to get preferential hiring of the seller's employees at the buyer's old plants, directly violating the buyer's CBA with its union at those plants.  Thus an arbitration in favor of the seller's union members would cause the buyer to commit an unfair labor practice with its existing union.  The court of appeals reversed the lower court and refused to order the arbitration on issues of job transfers and preferential hiring where buyer and seller of plants had collective bargaining agreements with different unions and union representing employees in seller's former plant sought judicial order compelling buyer to arbitrate issues which directly involved buyer's obligations under its collective bargaining agreements with other unions at its other plants, objectives of national labor policy dictated that arbitration not be compelled on particular issues of job transfers and preferential hiring of former employees of seller at buyer's other plants.  It noted:

> Any effort on [the buyer's] part to comply with an arbitration award covering those matters would result in violation of its collective bargaining agreements with those other unions and the commission of unfair labor practices; and even the mere fact of arbitrating with one union issues which are committed to the exclusive bargaining purview of another union would create the very kind of industrial strife and unrest which it is the objective of national labor policy to avoid.

*Id.* at 1253.

This case also made it clear that the question of whether a particular dispute is prima facie covered by collective bargaining agreement's arbitration procedure is a question for the

15

court to decide under § 301.  *Id.* at 1252.

Similarly, in *McGuire v. Humble Oil & Refining Co.*, 355 F.2d 352 (2d Cir. 1966), the buyer hired some of the seller's former employees to continue working in the business and they sought arbitration on a grievance under their CBA.  Yet, the buyer had obtained from the National Labor Relations Board a decision clarifying that the bargaining unit was the union which had represented the buyer's employees and it was "the sole bargaining agent for all current employees including those formerly working for the seller."  Under those circumstances, the Second Circuit refused to compel arbitration with the seller's union, fearing that arbitration which might result in the seller's union continuing to represent former employees of the seller could lead to unrest and dissatisfaction among the majority of buyer's employees. Such arbitration would not serve the objective of avoiding industrial strife, but rather might foster it.

In the present case, GEM argues that failure to arbitrate is not a part of a prima facie case, because § 301 does not specifically require exhaustion of any grievance proceeding as is required in the Prison Litigation Reform Act, 42 USC §1997e (where exhaustion of administrative remedies is a prima facie element of a claim and must be plead with specificity). GEM is correct on this, and it also notes that courts have taken § 301 cases and determined that there were circumstances making for an exception to the exhaustion presumption.  It asserts it is an affirmative defense under Fed. R. Civ. P. 8(c) and must be plead in response to the complaint.[10]

---

[10] Fed. R. Civ. P. 8(c):
  In pleading to a preceding pleading, a party shall set forth affirmatively accord and
  satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge

It notes that other federal courts have determined that the failure to exhaust administrative remedies is not a jurisdictional bar to hearing a plaintiff's claims, "but is an affirmative defense which must be pled and proved by the Defendant." *Local 323, et al v. International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers,* 160 F. Supp. 2d. 500 (W.D.N.Y. 2001). *See also Sellers v. MC Floor Crafters, Inc.,* 842 F.2d 639 (2nd Cir. 1988); *Johnson v. General Motors,* 641 F.2d 1075 (2nd Cir. 1981). Because exhaustion of remedies is an affirmative defense, application of the defense is governed by federal procedural law.  *The Legal Aid Society v. The City of New York,* 114 F. Supp. 2d 204 (S.D.N.Y. 2000).

While it may technically be the case that exhaustion in a § 301 case is an affirmative defense, Bricklayers 9 have yet been required to answer because they are raising exhaustion in their joint preliminary motion to strike or dismiss.  The Sixth Circuit has allowed a failure to exhaust grievances defense to be raised in a Fed. R. Civ. P. 12(b)(6) motion to a § 301 claim. *United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry, Local No. 577 v. Ross Bros. Const. Co.,* 191 F.3d 714, 718 (6th Cir. 1999) and  *United Food and Commercial Workers, Local 17A v. Fresh Mark*, 81 Fed.Appx. 23, 24 (6th Cir.2003).[11]  Both

---

in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense.


[11] *Fresh Mark* was a § 301 and ERISA claim under the Employee Retirement Income Security Act of 1974 , as amended, 29 U.S.C. § 1001 *et seq.,* against various employers alleging (1) breach of  contract pursuant to § 301; (2) a state-law unjust enrichment claim based on the same alleged breach of contract; and (3) a claim for ERISA violation of § 502(a)(1)(B), (a)(3).
*Ross Bros. Const. Co.* was a § 301 and ERISA claim that the employer improperly calculated premiums

granted the motion to dismiss for failure to exhaust.  In *Ross Bros. Const.* there was an issue of

whether the arbitrator could provide a monetary remedy because it did not involve fringe benefit

payments, but rather health insurance premiums allegedly being overcharged to the union

members, The Sixth Circuit noted the broad scale of arbitrator's power to fashion an appropriate

remedy:

> [A]rbitrators have authority to award money damages for contract violations even
> though the contract does not specifically provide such a remedy. To restrict
> arbitrators to remedies specifically set forth in the contract would negate
> arbitration as a method of dispute settlement ...
> Elkouri & Elkouri, How Arbitration Works 579-80 (Marlin M. Volz & Edward P.
> Goggin eds., 5th ed.1997); *see also id.* at 393 (" '[T]he authority of an arbitrator to
> award damages is as truly and integrally a part of the contract as if it were written
> there in unmistakable English and boldface type.' ") (quoting *Jeffrey Mfg. Co.*, 34
> Lab. Arb. (BNA) 814, 825 (1960)(Kuhn, Arb.)).

 *Ross Bros. Const. Co., supra,* 191 F.3d at 718.

In the present case GEM has provided no justification to avoid the presumption requiring

this court to reject a claim under § 301 where there is a mandatory arbitration clause other than

to cite those merger type cases where inconsistent outcomes are possible if arbitration is allowed.

Yet, this case does not involve an employer whose only act was being involved in a merger faced

an situation where the arbitration under one union's CBA "*directly involved* [the employer]

obligations under its collective bargaining agreements with other unions."  (Emphasis supplied).

If an arbitrator ordered job transfers and preferential hiring of former employees of the seller at

---

under the CBA's  prescription drug plan.

18

the buyer's other plants, this "directly" violated the buyer's CBA agrements over hiring and transfers to his existing workers.  In the present case, GEM signed CBA's with two unions promising fringe-benefit contributions for work done at certain sites, and these promises overlapped on work done in St. Clair and Lapeer counties and possibly portions of Macomb county.  While GEM might have resolved certain of the conflicts in a 10(k) proceeding before the NLRA, it chose not to.[12]  It also might have sought a joint arbitration with Plasterers 67 and Bricklayers 9 when Plasterers 67 sought arbitration before the JGB, and filed a § 301 action in this court to compel such joint arbitration.  Yet, those opportunities are now past.  Plasterers 67 has brought an enforcement action with an extremely limited scope of review available as noted above in footnote 13.  Unlike the cases involving mergers cited by GEM, having to pay fringe benefits to Plasterers 67's fringe-benefit funds for work not done by any of their union members does not *directly* conflict with any obligation to pay, or with any past payments made, to the Bricklayers 9's fringe-benefit funds for work performed by Bricklayers 9's members. Enforcement of an arbitration award requiring payment of fringe benefits to Plasterers 67's fringe-benefit funds for work done by Bricklayers 9 union members does not expose GEM to an unfair labor practice from Bricklayers 9.  While GEM may have been able to resolve this "jurisdictional conflict" and avoided double payment by undertaking greater care and/or seeking certain procedural relief in the past, any neglect or carelessness by GEM does not create the sort

---

[12]  In the prior NLRB  proceeding, it might have been awkward trying to assert that the jurisdiction should be awarded to Plasterers 9 from whom GEM hired the bulk of its workers at the disputed job sites, when their CBA did not cover any portion of Macomb county, while the Plasters 67's and Bricklayer 1's CNA's did cover portions of Macomb county.

of exceptional circumstance under which federal courts are willing to fashion an exception to the prima facie requirement that binding arbitration be undertaken prior to seeking to bring a § 301 concerning a subject covered by the CBA's arbitration clause.

Thus, it is recommended that Bricklayers 9's motion to dismiss under Rule 12(b)(6) be granted as it was in the *Fresh Mark* and *Ross Bros. Const.* cases.

### (B.) Discovery

GEM has agreed  that it will not engage in discovery until a ruling is made on BAC's motion to dismiss.  Yet, because it is being recommended that the third-party complaint against Bricklayers 9 be dismissed and the trustees of the Bricklayers 9 Fringe Benefit Funds not be added, leaving only the Plasterers 67's enforcement action, all discovery currently being sought from the  Michigan Bricklayers 9 Fringe Benefit Funds and its third-party administrator (TIC International) is stayed unless and until GEM can demonstrate this discovery is relevant and material to its defense against Plasterers 67's enforcement action and not available from other sources such as its own business. [13]

---

[13]    In *Interstate Brands v. Chauffeurs, Teamsters Local, 135,* 909 F.2d 885, 888 - 889 (6th Cir. 1990), the Sixth Circuit noted the well-established principle that courts play only a limited role in reviewing labor arbitration awards.  *Interstate* cites *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36 (1987), which  reaffirmed the Supreme Court's longstanding commitment to the highly deferential standard of review of arbitrator's decisions, and *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598 (1960).

*Bruce Hardwood Floors v. Southern Council of Industrial Workers,* 8 F.3d 1104, 1107 (6th Cir. 1993), noted that "when courts are called on to review an arbitrator's decision, the review is very narrow; one of the narrowest standards of judicial review in all of American jurisprudence." quoting *Lattimer-Stevens Co. v. United Steelworkers of Am., AFL-CIO, Dist. 27, Sub-Dist. 5,* 913 F.2d 1166, 1169 (6th Cir. 1990).

Under this line of authority a court may not reconsider the merits of an award even when the parties allege that the award rests on errors of fact or on misinterpretation of the Contract.  *Misco,* 484

**Motion 2:   Bricklayers 9's  Motion to Set Aside June 29, 2005 Order** (Dkt. # 19)

---

U.S. at 36.  As long as the arbitrator's award "'draws its essence from the collective bargaining agreement,' and is not merely the arbitrator's 'own brand of industrial  justice,'" the Court must enforce the award. *Id.*
The *Misco* court's characterization of the role of judges in the process of collective bargaining is an affirmation of prior Supreme Court pronouncements on the subject:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

> The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

*United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 567 - 568 (1960).
 *Bruce Hardwood Floors* noted the following guidelines:

> There may be a departure from the essence of the agreement if "(1) an award conflicts with express terms of the collective bargaining agreement, (2) an award imposes additional requirements that are not expressly provided in the agreement, (3) an award is without rational support or cannot be rationally derived from the terms of the agreement, and (4) an award is based on general considerations of fairness and equity instead of the precise terms of the agreement."

*Bruce Hardwood Floors*, 8 F.3d at 1107 (quoting *Dobbs, Inc. v. Local 614, Int'l Bhd. of Teamsters*, 813 F.2d 85, 86 (6th Cir. 1987) (quoting *Cement Divs., Nat'l Gypsum Co. v. United Steelworkers, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986).
 Given the extremely limited scope of review in a case involving enforcement of an arbitration, the discovery does not appear material to this case nor likely to lead to the discovery of any admissible evidence.  See e.g. *Local 8 Intern. Broth. of Elec. Workers v. CSX Transp., Inc.,* 230 F.Supp.2d 801, 802 - 803 (N.D. Ohio, 2002):

> Neither party has cited, and independent research has not uncovered,  [*803]  cases allowing discovery pending a district court's review of a Board's decision.  The scope of review in this court is limited to determining whether the arbitrator's decision was "wholly baseless and without foundation." See, e.g., *Schneider v. S. Ry. Co.,* 822 F.2d 22, 24 (6th Cir. 1987).

Discovery is generally not allowed in other circumstances here the scope of  judicial review is limited. See generally *Lasser v. Reliance Standard Life Ins. Co.,* 130 F. Supp. 2d 616, 628 (D. N.J. 2001) (disallowing demand for discovery in an ERISA case where standard of review was arbitrary and capricious, rather than de novo); *Hughes v. Life Ins. Co. of North America,* 112 F. Supp. 2d 780, 782 (S.D. Ind. 2000) (same).

The June 29, 2005, order reiterates the April 12, 2005, denial of GEM's motion to dismiss, which was heard on March 2, 2005, notes the "parties have stipulated on the record to the joinder of [Bricklayers 9]," and orders that Bricklayers 9 be joined as a third-party defendant in this action.  The March 2, 2005, docket entry notes that the "PARTIES STIPULATED TO JOINDER."  Bricklayers 9 argues that GEM got the June 29 stipulated order entered  –  which was only stipulated to by GEM and Plasterers 67 –  after Bricklayers 9 filed its motion to dismiss (Motion # 1 above) on June 22, 2005.  It claims that this was an attempt to bypass Bricklayers 9's motion  and negate its argument that Bricklayers 9 was improperly joined.  Bricklayers 9 offers as proof the fact that GEM had already filed its third-party compliant on May 13, 2005, and Bricklayers 9 had already returned the executed summons on June 13, 2005 and filed its June 22 motion to dismiss.  Thus,  Bricklayers 9 argues that it was not proper for a stipulated order to be entered without notice to Bricklayers 9 that was a party at that point.  Bricklayers 9 further points out that since the motion argued in March was already disposed of in Judge Borman's decision and order of April 12, 2005, the June 29th order had no other purpose.

GEM responds that they were just trying to memorialize what happened on the record in March and that they had no obligation to include Bricklayers 9 because they weren't a party to the March proceeding.

**Analysis of Motion 2:**

If the Court accepts the recommendation that the third-party complaint be dismissed under Rule 12(b)(6), striking this prior order is essentially moot and is thus denied.

**Motion 3:**     **Bricklayers 9 Motion for Sanctions** (Dkt. # 23)

Bricklayers 9 repeats its allegations in its motions and requests sanctions under 28 U.S.C. § 1927 and Fed. R. Civ. P 11  saying the suit is untimely and frivolous for reasons stated above.

**Analysis of Motion 3:**

The sanctions sought under 28 U.S.C. § 1927 are denied because Bricklayers 9 has failed to demonstrate that GEM's actions were efforts to extend the proceedings unreasonably or vexatious.  Albeit unsuccessful, they appear to be efforts to undo GEM's past failings and avoid having to pay fringe-benefits twice, which is not an unreasonable goal.  Its efforts to achieve this goal may be unsuccessful, but that alone does not raise them to the level of 28 U.S.C. § 1927.

The Rule 11 motion was served on GEM June 27, 2005, more than 21 days before filing it in this Court on July 19, 2005, as required by Rule 11(c)(1)(A).  Yet, this sanction motion is also denied.  While this report and opinion rejects the cases cited by GEM for its asserted exception to its CBA arbitration obligation, its claim to be exempt from arbitration in order to attempt to avoid paying fringe-benefits twice was not totally frivolous or without some reasoned basis to extend the reasoning of certain case law to the present situation.


**Motions 4 and 5: GEM's  Motion to Amend Third- Party Complaint and GEM's Motion to Join Parties (PensionFunds)**

GEM seeks to amend its third-party complaint to add a claim for indemnification and breach of CBA against Bricklayers 9 and to add an unjust enrichment claim against the Trustees of Bricklayers 9's Fringe Benefit Fund whom it wishes to add as a party).  As noted above, these

will be treated as a motion to add two new third-party claims against GEM and a third-party

claim against the Trustees of Bricklayers 9's Fringe Benefit Fund

**Analysis of Motions 4 and 5:**

Fed. R. Civ. P.  14(a) provides:

> At any time after commencement of the action a defending party, as a third-
> party plaintiff, may cause a summons and complaint to be served upon a person not a
> party to the action who is or may be liable to the third-party plaintiff for all or part of the
> plaintiff's claim against the third-party plaintiff.

Rule 14 is derived from the common law concept of "vouching to warranty" where a

party having his warranty of title challenged by a buyer could "vouch in" his seller who

warranted the title to him.  Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE,

Civil 2d §1441 (West 1990).  This method of settling a single interrelated dispute involving

"the same transaction or occurrence that forms the basis of the original action" was later

expanded to join third parties on claims of a "right of contribution or indemnity, or any other

remedy."  *Id.*  While originally done totally at the discretion of the court when the rule was

adopted in 1938 , Rule 14(a) was amended in 1963 to allow it as right within 10 days of the

defendant filing its answer.  Thereafter, it is again at the Court's discretion. Even if done in

the "safe harbor" 10 day period, "[t]he amended rule also gives the court broad power on

motion of any party to strike the third-party claim or to order severance or separate trials." *Id.*

> Rule 14 is intended to provide a mechanism for disposing of multiple claims
> arising from a single set of facts in one action expeditiously and economically.

> Furthermore, impleader is available only against persons who are or may be
> liable to defendant for part or all of plaintiff's claim; it cannot be used as a

24

way of combining all controversies having a common relationship in one action.

*Id.* at § 1442. (footnotes omitted).

As noted in the cases cited therein, Rule 14 is not intended to be used as a means for trying two separate and distinct causes of action in the same proceeding or joining any claim that may happen to have some relationship with the original claim..  It seems that Rule 14 is to be used when there is a direct line of liability alleged between the defendant/third-party plaintiff and third-party defendant that is triggered by the plaintiff prevailing in whole or in part against the defendant/third-party plaintiff.

The Seventh Circuit upheld the district court's denial of the filing of a third-party complaint under Rule 14(a) because

> there was no claim that any one of the additional parties would be secondarily liable to [defendants/third part plaintiffs] in the event it was found in the original cause that [defendants/third part plaintiffs] were liable to appellees. That is a plain condition on the face of Rule 14. The rule is not altered merely by the fact that the alleged third-party claim grew out of the same transaction. *Parr v. Great Lakes Express Co.,* 484 F.2d 767 (7th Cir. 1973); *U. S. Fidelity Guaranty Co. v. American State Bank,* 372 F.2d 449 (10th Cir. 1967).

*U. S. General, Inc. v. City of Joliet*, 598 F.2d 1050, 1052 -1053 (7th Cir. 1979) (Footnote omitted).

Under Rule 14 of the Federal Rules of Civil Procedure the additional party pension funds can not be added as third-party defendants because there was no claim that any one of the additional parties would be secondarily liable to GEM in the event it was found that this Court should enforce Plasterers 67 award against GEM.

25

Similarly, while GEM makes conclusory allegations that Bricklayers 9 is liable to it if it is liable to Plasters 67, it asserts no facts supporting this conclusion.  On the indemnification claim, it cites a sentence from Article I of the Bricklayers 9 CBA: "The Union will hold the Company harmless and indemnify them for any loss suffered as a result of the Union representation."  It is beyond dispute that any liability GEM has to Plasterers 67 under its CBA with Plasterers 67 is not a loss "suffered as a result of the [Bricklayers 9] representation."  Rather, if the arbitration award is enforced it is the result of GEM's CBA with Plasterers 67, not Bricklayers 9.  While it is true that GEM paid fringe-benefits to Bricklayers 9's pension funds for work done on GEM's jobs by Bricklayers 9 workers, if this is deemed a "loss" to GEM, it clearly is not the type of "loss" contemplated by the parties in Article I.  Were it such a "loss," then any fringe-benefits paid by GEM to the Bricklayers 9 pension funds – and possibly even the wages paid to Bricklayers 9 workers – for work by Bricklayers 9 members on GEM's work sites could lead to an indemnification claim against Bricklayers 9.  It is a stretch to interpret this language in Article I as Bricklayers 9 agreeing to indemnify GEM for the fringe-benefits it negotiated would be paid to Bricklayers 9 members under the CBA for work done on GEM's projects.

The Breach of Contract claims against Bricklayers 9 for detrimental reliance and unjust enrichment also boarder on novel to nonexistent under the law.   Yet, this Court need not determine the merits of the these two alleged contract claims nor the indemnification claim other than to determine that they, like the claim against the Bricklayers 9's pension

26

funds trustees, are not connected nor triggered by a finding of liability by GEM to Plasterers 67, and thus not appropriate for being added under Rule 14.

These claims, if they exist, are unquestionably entangled with a set of facts, evidence and arguments in many ways unrelated to Plasterers 67's claim for enforcement of its arbitration award.  They do not involve a direct line of liability between the GEM and Bricklayers 9 or its pension trustees that is triggered by Plasterers 67 prevailing in whole or part against GEM. To resolve the novel claims as an appendage to Plasterers 67's claim in this court is not "a mechanism for disposing of multiple claims arising from a single set of facts in one action expeditiously and economically" as Rule 14 intended.  Here, as in the *Joliet* case, the alleged third-party claims at best grow out of the same transaction as the underlying claim of Plasterers 67 –  work done by Bricklayers 9 members at sites over which Plasters 67 also claims jurisdiction.  Yet, as the *Joliet* case made clear, that is not sufficient to meet the standards of Rule 14.  Here the claims involve different parties, a different CBA, a different fringe-benefit fund. Even if they involve the same hours of the same employees at the same job sites as involved in the Plasterers 67's claim, to add these claims to this action would expand, complicate and potentially confuse what is a relatively simple grievance award enforcement action under § 301.  All of the asserted third-party claims do not qualify as the type of claims Rule 14 anticipated to resolve multiple claims "expeditiously and economically."  Accordingly, in the exercise of this Court's discretion, GEM's motion to add these claims and the trustees as a party is denied.

27

**Motion 6:**      <u>**GEM's Motion to Extend Dates**</u>

In the May 17, 2005, Scheduling Order with discovery cut-off date of September 16, 2005, GEM agreed to stay discovery pending outcome of motion to strike its third-party complaint.  The Court will adjust the scheduling order as it deems appropriate after ruling on the objections to this report, recommendation and opinion.

**Motion 7** : <u>**GEM's Motion to Strike Bricklayers 9's Reply Brief**</u> **(Dkt. # 45)**

GEM's moves to strike Bricklayer 9's August 16, 2005,  reply brief  based on the assertion that Bricklayer 9's brief was filed in violation of Local Rule 7.1 both as to its length and to the time allowed for filing a reply brief to a response.  GEM is correct that Bricklayers 9's reply brief was not in compliance with Local Rule 7.1.  Yet, a portion of the brief dealt with the issue of exhaustion of administrative remedies, which was a substantial area of discussion at the oral arguments.  Indeed, the issue of whether this exhaustion requirement was a part of the prima facie claim or an affirmative defense was the topic of the supplemental briefing.  Had Bricklayers 9 known that their reply brief was stricken, it could have addressed this issue in their supplemental briefing or sought leave of court to file a brief on it.  Accordingly, pages 1- 7 of Bricklayer 9's August 16, 2005, reply brief  are accepted for consideration.  The remainder of the Bricklayers 9's reply brief on the merits is stricken.  This opinion and report does not address GEM's claims in its proposed amended third-party complaint on the merits.  These are the topics which make up the bulk of the Bricklayer 9's August 16, 2005,  reply brief.  This opinion and report solely addresses GEM's  newly

asserted claims to determine if the claims are the type that are appropriately added by way of a third-party complaint under Rule 14.

**Motion 8: Bricklayers 9's Motion to Strike GEM's 'second' supplemental brief of September 20, 2005 (Dkt. # 53)**

Bricklayers 9's motion to strike GEM's Second Supplemental Brief is based on a scheduling order allowing supplemental briefing on limited issues. GEM was to file a brief on or before September 7, 2005, and Bricklayers 9 was to file a response by September 13, 2005. This order did not intend additional briefs after that. GEM's brief of September 20, 2005, was not filed pursuant to a court rule or order of the court, nor did it seek leave of court to accept a further brief.

Nonetheless, the brief was considered. Its argument that courts should intervene to avoid industrial strife cites cases that are distinguishable. Those cases involved situations where an arbitration award in favor of union #1 would, if enforced, directly affect the employer's obligations against union #2. This is not the case here for reasons noted above. Unlike many of the cases cited by GEM, the employer did not get involved in its "conflict" situation from a merger or other legitimate transaction with third-parties other than the unions, where the employer caught in the dilemma "inherited" a CBA with a union and was not involved in the bargaining and signing of that CBA. Rather, the employer involved here (GEM) was the legal entity contracting with both of the unions which now have conflicting claims.

If GEM was concerned about a long-standing jurisdictional conflict between

29

Plasterers 67 and Bricklayers 9, the time to have sought federal court intervention was when Plasterers 67 sought arbitration against GEM before the JGB on May 4, 2004.[14]  This Court then might have either (1) ordered joint arbitration, or (2)  intervened and resolved the jurisdictional dispute, or (3) terminated the arbitration under the "industrial strife" exceptions to the general rule fostering arbitration, or (4)terminated the arbitration because of no JGB jurisdiction if GEM was correct in its assertion that its CBA with Plasterers 67 had expired. Yet, GEM took no action in this Court, no action before the JGB, and did not pursue any 10(k) action before the NLRB.  Yet, it now seeks to have this Court perform judicial gymnastics in an enforcement action where the legal stage setting and burdens of proof are far different than might have been earlier in the dispute.

Finally, if as GEM contends in its September 20, 2005, brief, its legal claim(s) against Bricklayers 9 and its pension funds are not ripe unless and until this Court orders enforcement of the JGB award in favor of Plasterers 67, GEM can still seek arbitration against Bricklayers 9 for any alleged CBA violation, and if such claims exist, the arbitrator can determine the extent to which there may be authority through Bricklayers 9 to make any adjustments in the Bricklayers 9 pension fund trusts.

In sum, nothing in GEM's September 20, 2005, brief alters this decision's conclusion that Rule 14(a) is not a proper vehicle for GEM to "piggyback" its multiple, different, novel

_____

[14] This argument assumes, without a formal finding, GEM's assertion that it could not have sought a 10(k) hearing before the NLRB to resolve the jurisdictional conflict because Bricklayers 9 has not committed any unfair labor practice.

and complicated claims against Bricklayers 9 and its pension funds onto Plasterers 67's simple enforcement action.

## IV.  RECOMMENDATION AND ORDERS

For reasons stated above, **IT IS RECOMMENDED** that Third-Party Defendant Bricklayers 9's Motion to Dismiss Complaint and Stay Discovery (Dkt. #16) **BE GRANTED** for Defendant Third-Party Plaintiff's failure to exhaust mandatory grievance proceedings under the collective bargaining agreement with the Third-Party Defendant or demonstrate why this Court should disregard its agreed upon means for dispute resolution.

**IT IS FURTHER ORDERED** that Third-Party Defendant Bricklayers 9's motions to Set Aside the June 29, 2005 Order (Dkt. # 19), for Sanctions (Dkt. # 23), and to Strike GEM'S Second Supplemental Brief (Dkt. # 53), and Defendant GEM's motions to Amend Third-Party Complaint (Dkt. # 31), to Join Parties (Pension Funds) (Dkt. # 32), to Strike Bricklayers 9's Reply Brief (pages 1-7) (Dkt. # 45) **BE DENIED** and its Motions to Extend Dates (Dkt. # 37), to Strike Bricklayers 9's Reply Brief (pages 8 ff) (Dkt. # 45)  **BE GRANTED.**

The Court will issue an amended scheduling order upon review of any objections to this report, recommendation and opinion.

## V.    REVIEW

Any  party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in

31

28 U.S.C. section 636(b) and E.D. Mich. LR 72.1(d).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *United States v. Walters,* 638 F.2d 947

(6th Cir. 1981), *Thomas v. Arn,* 474 U.S. 140 (1985). Filing objections which raise some

issues but fail to raise others with specificity will not preserve all objections that party might

have to this Report and Recommendation.  Smith v. Detroit Fed'n of Teachers Local 231, 829

F.2d 1370, 1373 (6th Cir. 1987). Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir.

1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon

this Magistrate Judge.


Dated: November 01, 2005                                s/Steven D. Pepe
Ann Arbor, Michigan                                     United States Magistrate Judge


<u>Certificate of Service</u>

        I hereby certify that copies of this Order were served upon the attorneys of record by electronic means
or U. S. Mail on November 01, 2005.

                                                s/William J. Barkholz
                                                Courtroom Deputy Clerk

**Appendix A**

<u>CHRONOLOGICAL AND FACTUAL BACKGROUND</u>

From *Gem Management Company, Inc.* 339 NLRB No. 71

On November 1, 2002, Administrative Law Judge Eric M. Fine, made the following findings that were upheld by the NLRB on June 30, 2003, and the Sixth Circuit on August 19, 2004. *Gem Management Company, Inc.* 339 NLRB No. 71 (2003), *N.L.R.B. v. Gem Management Co.* 107 Fed. Apex. 576, 577 (6th Cir. 2004).

**JUNE 1, 1997**

Former Plasterers 67 negotiated a collective-bargaining agreements with the Detroit Association of Wall and Ceiling Contractors that later became known as the Architectural Contractors Association ("ACT") with effective dates of June 1, 1997, through May 31, 2000 (the 1997 ACT agreement). The 1997 ACT agreement contains a union security clause requiring employees who are union members on the effective date of the agreement to remain members as a condition of employment. New employees were required to become union members following the eighth day of their employment as defined in the agreement. The 1997 ACT agreement provides, in pertinent part:

Article IX entitled "Jurisdiction" Section 12. defined "Detroit Trade Area" as:

> The area in which these working rules apply is all of Wayne County and those parts of Macomb and Oakland counties which lie south of Thirteen Mile Road.

**FEBRUARY 9, 1999**

George Moore, the president and sole shareholder of GEM, signed an agreement on February 9, 1999, agreeing to be bound to the Michigan Council of Employers' 1997 to 2000 agreement with Bricklayers 9 (the "1997 MCE agreement"). Based on this 1997 MCE agreement, GEM later became bound to Bricklayers 9's agreement with the MCE running from the period of June 22, 2000, to August 1, 2003 (the "2000 MCE agreement").  The 2000 MCE agreement states in Article II, that "[t]his Agreement shall be in effect within the boundaries of the State of Michigan, excluding all the counties in the Upper Peninsula and excluding the counties of Wayne, Oakland, Macomb, and Monroe in the Lower Peninsula. All other Michigan counties are included."

**JUNE 30, 1999**

On June 30, 1999, Plasterers 67 and a representative of  ACT signed off on an amendment to the 1997 ACT Agreement amending Article IX, Section 12 and expanding Plasterers 67's territorial jurisdiction to include:

> The geographic territory governed by this agreement consists of Wayne, Oakland, Lapeer, Macomb and St. Clair Counties." [15]

**OCTOBER 2, 1999**

---

[15] For reasons footnoted below, ALJ Fine found that: (1)  Moore and GEM were never provided a copy of this June 30, 1999 agreement when they signed the Agreement for Non-Association Members with Plasters 67 on October 2, 1999;  and (2) GEM  was not bound by the June 30, 1999 agreement because it was a prior amendment to the 1997 ACT Agreement, and Moore only agreed to be bound by subsequent amendments to the 1997 ACT Agreement.

In late 1999, a representative of Plasterers 67 met with some of GEM's employees at one of its job sites, and thereafter called GEM's president Moore informing him that GEM would have to enter into an agreement with Plasterers 67 in order to work in the area.[16]  On October 2, 1999, Moore, on behalf of GEM, signed, via facsimiles copies, an "AGREEMENT FOR NON-ASSOCIATION MEMBERS" with Plasterers 67.  This was a "me too" agreement noting:

> This is to certify that I have read the Agreement between the Detroit Association of Wall and Ceiling Contractors and Plasterers' Local Union No. 67 and I agree to be bound by all provisions contained in this Agreement and any changes that may be made in the future by mutual consent of said parties for the life of this Agreement and any successor agreements.

This language adopts by reference the 1997 ACT agreement making Plasterers 67 the exclusive collective bargaining representative in the jurisdiction  for the period of June 1, 1997, through May 31, 2000.  Plasterers 67 does not operate an exclusive hiring hall.  Rather, signatory employers can call Plasterers 67 for referrals of employees, or they can hire employees off the street, who are required to become union members under the collective-

---

[16] Moore testified before the ALJ that in October 1999, the representative of  Plasterers 67 told him that its jurisdiction was Wayne, Macomb, Oakland, and Monroe counties south of 13 Mile Road and that Bricklayers 1 has jurisdiction with GEM north of 13 Mile Road.  ALJ Fine discounted Moore's testimony as incorrect for two reasons.  First, Plasterers had signed a June 1999 amendment to the 1997 ACT agreement expanding its jurisdiction to all of Oakland, Macomb and Monroe – not just south of 13 Mile Road as Moore contends. Thus, its representative in the fall of 1999 would not limit Plasterers 67's jurisdiction to areas "south of 13 Mile Road ."  Second, in October 1999 GEM did not have a contract with Bricklayers 1 and thus there was no basis for a Plasterers' representative to assert that Bricklayers 1's jurisdiction was  north of 13 Mile Road.  Additionally, when GEM did agree to a CBA with Bricklayers 1 on June 2, 2000,  that CBA's  territory for Bricklayers 1 was for all of  "Wayne, Oakland, Macomb, and Monroe Counties" and not just north of Thirteen Mile Road.

bargaining agreement's union security provision.

While Moore did not originally receive a copy of the 1997 ACT agreement as he acknowledged, he admits receiving it four months later.  The original 1997 ACT agreement limited jurisdiction in Macomb and Oakland counties to areas "south of Thirteen Mile Road."  While the June 1999 amendment expanded jurisdiction to all of Macomb and Oakland county as well as Lapeer county, the ALJ and NLRB did not bind GEM to this amendment because it was a "past" not a "future" amendment to the CBA Moore finally received.  Plasterers 67 did not demonstrate that Moore received the June 1999 amendment.  Yet, Moore and GEM did agree to be bound to subsequent agreements.

**MAY 31, 2000**

On May 31, 2000, Plasterers 67 entered a new collective-bargaining agreement (the 2000 ACT agreement). The 2000 ACT agreement has a June 1, 2000, effective date and a May 31, 2003, expiration date.  The 2000 ACT agreement reiterated the June 30, 1999, jurisdictional amendment, and provides that:

> "The geographic territory governed by this agreement consists of Wayne, Oakland, Lapeer, Macomb and St. Clair Counties."

**JUNE 2, 2000**

The 1997 ACT agreement, even in its unamended form, gave Plasterers 67 jurisdiction "in those parts of Macomb and Oakland counties which lie south of Thirteen Mile Road."   The 2000 ACT agreement, effective  June 1, 2000, included all of Oakland and Macomb counties in the jurisdiction of Plasterers 67.  Yet, on  June 2, 2000, after George

36

Moore admitted having received a copy of the 1997 ACT agreement, GEM entered into a contract containing a union security clause  with Bricklayers 1, "for all persons employed performing plasterers' work: ... on all present [and] future job sites within the geographic area of Wayne, Oakland, Macomb, and Monroe Counties" (the "Bricklayers 1 CBA").   Under the Bricklayers 1 CBA, the employer agrees that any dispute concerning its obligation to recognize Bricklayers 1 as sole and exclusive bargaining representative will be resolved solely under Article XIV (Grievances), and the employer also expressly waives any right to abrogate or repudiate this agreement during it effective term or to seek a National Labor Relations Board election during the term of this Agreement.

Part of Plasterers 67's complaint before the NLRB was that GEM applied the Bricklayers 1 CBA to Plasterers 67's unit work and is paying the benefits provided for in Bricklayers 1 CBA.  Plasterers 67 also complained that GEM hired Bricklayers 9 plasterers, paid them wages below those in the ACT agreements with Plasterers 67, paid fringe-benefits to Bricklayers 9 benefit funds, and steered new hires to be signed up as Bricklayers 9 union members.

**NOVEMBER 2000**

In November 2000, Plasterers 67 and GEM signed off on an amendment to the 2000 ACT agreement. The amendment, has an effective date of November 21, 2000, and again changed Article IX, Section 12, to read as follows:

Section 12. Territorial Coverage of the Agreement

The geographic territory governed by this Collective Bargaining Agreement consists of Wayne, Oakland, Lapeer, Macomb, St.

37

> Clair, Washtenaw, Sanilac and Livingston Counties excluding in
> Livingston County the townships of Conway, Cohoctah, Deerfield,
> Handy, Hartland, Osceola, Tyrone, Howell and the City of Howell.

As noted above the 1997 ACT agreement had a May 31, 2000, expiration date and the 2000 ACT agreement had a May 31, 2003, expiration date. Article VIII of the 1997 ACT agreement and of the 2000 ACT agreement, entitled "Term of Contract," had an automatic renewal provision from year to year "unless notice of change is given not less than sixty (60) days nor more than ninety (90) prior to the date of such expiration of this Agreement, by either party to the other." Thus, the windows for termination were in March 2000 or any subsequent renewal year for the 1997 ACT agreement, and in March of 2003, or any subsequent renewal year for the 2000 ACT agreement. The ALJ noted that "Respondent [GEM] acknowledge that the provisions of Article VIII govern termination of those agreements" although there appears to be some disagreement as to which ACT agreement is operative.

GEM's president, Moore, wrote Plasterers 67's representative on June 25, 2001, noting: "Attention Local 67: As of June 25, 2001, GEM Management no longer wishes to have an agreement with your local." On July 20, 2001, Plasterers 67 responded that "According to the termination language in the Collective Bargaining Agreement we did not receive your letter in a timely fashion. Therefore GEM Management is still bound by the agreement."

Again on March 12, 2002, Moore signed off on a detailed letter to Plasterers 67, drafted by his then lawyer Thomas H. Weiss, notifying the union that GEM was terminating

its contractual relationship with Plasterers 67 under the 1997 ACT agreement.  The letter
asserted that GEM was not bound by the 2000 ACT agreement and therefore it was providing
timely notice of termination under Article VIII of the 1997 ACT agreement, which GEM
claimed had been automatically renewed on an annual basis.  In a March 14, 2002, response
Plasterers 67 stated its position that the attempted termination was untimely because,
pursuant to the non-association employer agreement Moore had signed, Respondent was
bound by the 2000 ACT agreement.

  For reasons stated by the ALJ, and adopted by the NLRB, it was determined that
GEM  was bound by the 2000 ACT agreement as a "successor agreement[]" to the 1997 ACT
agreement, but not by the June 1999 amendment to the 1997 Act agreement nor by the
November 2000 amendment to this successor agreement.  The ALJ also determined that both
of GEM's termination letters were ineffective in terminating the collective bargaining
agreement which he found continued to the time of his November 1, 2002, decision.[17]

---

[17]  In *GEM Management Company, Inc.,* 339 NLRB No. 71 (2003), the NLRB adopted ALJ Fine's
findings and his justifications in footnote 19:

> I therefore find that, by the terms of the nonassociation member agreement Moore signed
> in October 1999, Respondent was bound to the 1997 Act agreement and then became
> bound to the successor 2000 ACT agreement negotiated between Plasterers 67 and ACT.
> Since both Plasterers 67 and Respondent acknowledge that the provisions of Article VIII
> govern termination of those agreements, I find that Respondent's June 25, 2001, and
> March 12, 2002, letters did not constitute timely notice of termination of either of those
> agreements. [FN19]
>
> _____
>
> [FN19] I do not, however, find that Respondent was bound by the June 30, 1999,
> amendment to the 1997 ACT agreement or to the November 2000 amendment to the
> 2000 ACT agreement. The "me too" agreement Moore signed on October 2, 1999,
> certified that Moore had read the master labor agreement then in effect, and he agreed
> that Respondent was to be bound to "any changes that may be made in the future by

Plasterers 67 alleged that since October 2, 1999, it has been the exclusive collective-bargaining representative of the employees at certain job sites in Lapeer and Macomb counties (among others) and that GEM used Bricklayers 9 workers at those sites and failed to apply the 1997 ACT agreement as amended for all the bargaining unit work, and failed to pay benefits required by the agreement to Plasterers 67 and to the bargaining unit employees. It is also asserted that GEM paid money to the Bricklayers 9 funds to cover fringe benefits for employees covered by GEM's agreement with Plasterers 67. It is alleged that by this conduct, and GEM's steering newly hired workers to Plasterers 67, rendered unlawful assistance to labor organizations in violation of Section 8(a)(1) and (2) of the National Labor Relations Act. National Labor Relations Act ("the NLRA"), 29 U.S.C. § 151, *et seq.* Much of what Plasterers 67 asserted was acknowledged by GEM at the June 5, 2002, ALJ hearing, except it argued that Plasterers 67 did not have jurisdiction in Lapeer county under the pre-amended 1997 ACT agreement, which it contends is applicable.[18]

---

mutual consent of said parties for the life of this Agreement and any successor agreements negotiated by them." Since Moore had only agreed to bind Respondent to future changes in the 1997 ACT agreement, Respondent was not bound to the June 30, 1999, amendment which was negotiated in the past. For similar reasons, although I find that Respondent is bound by the successor 2000 ACT agreement, the "me too" agreement Moore signed did not provide that Respondent would be bound by any amendments to the successor agreement. Accordingly, I do not find that Respondent is bound to the November 21, 2000, amendment to the 2000 ACT agreement. In this regard, the Board has demonstrated it will strictly construe "me too" agreements and limit them to the precise terms of what a party has actually agreed to. See, Oklahoma Fixture Co., 333 NLRB 804, 807808 (2001).

[18] In early June 2001, a representative of Plasterers 67 came across a GEM job site at Lapeer Vocational Technical School in Lapeer County. The plasterers on the job told Van Allen they were not being paid Plasterers 67's contract rates.    At the June 5, 2002, ALJ hearing, George Moore testified that

Prior to the June 5, 2002, ALJ hearing On November 30, 2001, attorney Thomas

Weiss wrote the NLRB Region 7 investigator asserting that Plasterers 67 committed unfair

labor practices in violation of Section 8(b)(4)(D) of the Act and requests a 10(k) hearing to

determine the work jurisdiction of Plasterers 67 and Bricklayers 1. Weiss states in the letter

that:

> 2. GEM is a signatory and party to agreements with two labor
> unions which assert jurisdiction in Macomb County, Michigan:
> A. Local #67 of the Operative Plasterers; and

---

he was aware that Plasterers 67 asserted jurisdiction over this project but noted  that the Lapeer County job was outside of Plasterers 67's jurisdiction as defined in the pre-amended 1997 ACT contract.

In August of 2001, GEM was doing work at an Extended Stay America Hotel ("Extended Stay") located just south of 13 Mile Road in Macomb County.  Plasterers 67's representative met GEM's attorney, Thomas Weiss at the job site around October 14, 2001 because Bricklayers 9 members were performing work at the site.  Bricklayers 1's June 2, 2000 CBA covered Macomb but Bricklayers 9 CBA did not.  At the June 5, 2002, hearing George Moore admitted that the Extended Stay job site was south of 13 Mile Road and that it was within Plasterers 67's jurisdiction even under the preamended 1997 ACT agreement.  Moore testified further that Bricklayers 9 is the primary supplier of his company's plasterers and that all of GEM's employees performing plasterer's work at the Extended Stay job site save one were assigned to Bricklayers 9, even though the project was not in Bricklayers 9's jurisdiction. Three were Bricklayers 9 members transferred from another of GEM's locations, five or six employees were hired off the street and then signed up by Bricklayers 9, one was a Plasterers 67 member (who received its pay and benefits). Mr Moore acknowledged that all of these GEM employees were performing plasterer's work at the Extended Stay site. Moore notified Bricklayers 9 about these employees so that they could sign them up. Moore testified that members of Bricklayers 9 performing work on this job had their fringe benefits paid to funds under that union's contract.

Mr. Moore explained that he had Bricklayers 9 sign up the new employees at the Extended Stay job site because that union works in GEM's area, and if Plasterers 67 signed these employees up they would not have transferred to GEM's areas further north when the Extended Stay project was finished because they would have received lower wages when they transferred. Moore testified that Plasterers 67's contractual wages are about $2 to $3 an hour higher than that of Bricklayers 9. Mr.  Moore acknowledged that he was not aware of any agreement between Bricklayers 1 and Bricklayers 9 where GEM could use Bricklayers 9 members in an area covered by Bricklayers 1's CBA.  Regarding the Extended Stay job site in 2001, even though the June 2, 2000, Bricklayers 1 CBA included Macomb County which was also covered by the 2000 ACT agreement.  ALJ Fine quotes Mr. Moore acknowledging that at the time he believed the job site was in Plasterers 67's jurisdiction, and not in either Bricklayers 1 or Bricklayers 9 's CBAs.

B. Local #1 of Michigan, Bricklayers and Allied Craftsworkers
International Union of North America, AFL-CIO.

4. GEM utilized plasterers at a job located in Macomb County,
Michigan, specifically on 13-Mile Road at I-94;

5. GEM depended and relied upon both Local #67 and Local
#1 to provide those plasterers;

6. It is the employer's, GEM's preference that employees
represented by Local 1 perform the disputed work, in
accordance with GEM's previous assignment;

Yet, at the hearing, attorney Weiss acknowledged that no 10(k) complaint was ever

formally filed or pursued.[19]   ALJ Fine found that GEM violated Section 8(a)(1) and (2) of

the Act by unlawfully assisting Bricklayers 9, by violating its contract with Plasterers 67 and

--------

[19]  The ALJ reported the following exchange at the June 5, 2002, hearing, when the November 30,
2001, letter was introduced into evidence:

JUDGE FINE: Was an unfair labor practice Charge ever filed?
MR. WEISS: That is the only document that was filed with the Court.
JUDGE FINE: For the Board or the Region?
MR. WEISS: With the Region. I am sorry. With the Region and--
JUDGE FINE: You had already filled out a Charge form and filed it with the Region.
MR. WEISS: I was dissuaded from doing so because the explanation that was given to
me is that this matter was inappropriate for the Charge being made and the 10-K Hearing
request.
JUDGE FINE: All right but you never took it on your own initiative after that to file a
Charge.
MR. WEISS: I was relying upon the statement of the investigator.
JUDGE FINE: But you did not file a Charge?
MR. WEISS: We simply filed that letter.
JUDGE FINE: Right.
MR. WEISS: There is no separate Charge form filed.
JUDGE FINE: Right. Okay. So, there was never any investigation on the 10-K.
MR. WEISS: That is correct, Your Honor.
JUDGE FINE: By the Region.

42

notifying Bricklayers 9 of the ESA site in order for that union to sign up new hires, and by paying fringe benefits to Bricklayers 9's contractual funds when Respondent admittedly had no collective bargaining agreement with Bricklayers 9 that covered the work performed at the ESA job site. Yet, the ALJ determined that he did not need to decide the effect of GEM's contracts with other related unions – Bricklayers 1 and 9 – because: (1) these contracts covered different geographical territories, not all of which are in conflict; (2) despite GEMs claim to the contrary, it had actual or constructive knowledge even prior to Plasterers 67's amendments that Plasterers 67's geographical area conflicted to some extent with that of Bricklayers 1 and 9; and (3) to the extent that the geographical areas of the unions overlap GEM was free to file 8(b)(4) charges in the future and request a 10(k) hearing.

43