# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LOCAL 67, OPERATIVE PLASTERERS AND
CEMENT MASONS' INTERNATIONAL
ASSOCIATION, AFL-CIO,
                    Plaintiff,

vs.

GEM MANAGEMENT COMPANY, INC.,
                    Defendant
_____/

GEM MANAGEMENT COMPANY, INC.,
                    Third-Party Plaintiff

vs.

BRICKLAYERS & ALLIED CRAFTWORKERS
LOCAL 9, AFL-CIO
                    Third-Party Defendant
_____/

Case Number:  04-CV-73022-DT

JUDGE PAUL D. BORMAN
MAGISTRATE JUDGE STEVEN PEPE

### OPINION AND ORDER DENYING
Third Party Defendant Bricklayers  9's Motion to Set Aside June 29, 2005 Order (Dkt. # 19)
Third Party Defendant Bricklayers 9's Motion for Sanctions (Dkt. # 23)
Defendant GEM's Motion to Amend Third-Party Complaint   (Dkt. # 31)
Defendant GEM's Motion to Join Parties (Pension Funds)  (Dkt. # 32)
Defendant GEM's Motion to Strike Bricklayers  9's Reply Brief (Dkt. # 45)
Third-Party Defendant Bricklayers 9's Motion to Strike GEM's Second Supplemental Brief
(Dkt. # 53)

### AND GRANTING
Defendant GEM's Motion  to Extend Dates  (Dkt. # 37)

The numerous motions noted above have been referred pursuant to 28 U.S.C. § 636

(b)(1)(A) for a hearing and determination.  A telephonic hearing was held on August 23, 2005,

and was followed by a request to the parties for briefing on the issue of exhaustion of grievance remedies in a collective bargaining agreement.

## I. BACKGROUND FACTS

Defendant Gem Management Company, Inc. ("GEM ") is a Michigan corporation located in Clare, Michigan, that is engaged in the business of synthetic-plaster installation throughout Michigan.   On February 9, 1999, GEM entered into a collective bargaining agreement ("CBA") with  Bricklayers & Allied Craftworkers Local  9, AFL-CIO, ("Bricklayers  9"), located in Saginaw, Michigan,  that designates Bricklayers  9's work jurisdiction as the entire State of Michigan, with the exception of Wayne, Oakland, Macomb, and Monroe counties.

On October 2, 1999, GEM  entered into a standard, multi-employer CBA with Plaintiff, Plasterers 67, Operative Plasterers and Cement Masons International Association, AFL-CIO ("Plasterers 67"), which agreement ("Plasterers 67's CBA") identified Plasterers 67's work jurisdiction as Wayne, Macomb, Oakland, and Monroe counties south of 13 Mile Road in Michigan.  This CBA was a  "me too" agreement binding GEM to a 1997-2000 CBA between Plasterers 67 and the Detroit Association of Wall and Ceiling Contractors later known as the Architectural Contractors Trade Association (ACT) (the "1997 ACT agreement").  Plasterers 67 claims that GEM thereafter became bound by a 2000-2003 successor agreement to Plasterers 67's 1997 ACT agreement (the "2000 ACT agreement").  This 2000 ACT agreement expands Plasterers 67's work jurisdiction to include all of Wayne, Oakland, Macomb, Lapeer, and St. Clair Counties in Michigan.  Thus, the work jurisdictions for doing GEM's synthetic plaster installation work in Bricklayers 9's and Plasterers 67's CBAs overlapped as to Lapeer and St. Clair counties in Michigan.  GEM denies that it is bound by the 2000 Act agreement and

2

contends it terminated the 1997 ACT agreement as of March 7, 2003.

Both Bricklayers 9's and Plasterers 67's CBAs required GEM to pay wage and fringe-benefit contributions to each union's fringe benefit funds based upon employee work hours and to provide fringe benefits to employees.  Thus, depending upon the jurisdiction in which it worked, GEM was to make the requisite fringe-benefit contributions to Bricklayers 9 or to Plasterers 67, and in Lapeer and St. Clair Counties both unions claim fringe-benefit contributions.  Over the years in dispute, GEM paid contributions for work done in these two counties to Bricklayers 9's fringe-benefit funds through The Trustees of the Michigan Bricklayers 9 Fringe Benefit Funds whom it now seeks to add as a third-party defendant.

On October 21, 2001, Plasterers 67 filed an action against GEM  before the National Labor Relations Board ("NLRB"), alleging that GEM committed an unfair labor practice in violation of the National Labor Relations Act ("the NLRA"), 29 U.S.C. § 151, *et seq.*, when it failed to pay wages and fringe-benefit contributions under Plasterers 67's CBA.  After conducting a hearing on this claim, the NLRB's Administrative Law Judge Eric M. Fine ("ALJ") found that GEM was bound to Plasterers 67's 1997 ACT agreement and its successor 2000 ACT agreement and had failed to pay wages and fringe benefits in compliance with that CBA as to work performed within Lapeer County.  *Gem Management Company, Inc.*, 339 NLRB No. 71, (2003).  This decision was upheld by the NLRB and the Sixth Circuit Court of Appeals.  *Id.* and *N.L.R.B. v. Gem Management Co.*, 107 Fed.Appx. 576, (6th Cir. 2004).   The Court in its August 19, 2004, order enjoined GEM  from "[w]ithdrawing recognition from Local 67, Operative Plasterers' and Cement Masons' International Association, AFL-CIO (Plasterers 67) during the term of the collective-bargaining agreement between Plasterers 67 and Architectural Contractors

Association (ACT), with effective dates of June 1, 2000, through May 31, 2003, (the 2000 ACT

agreement)" and ordered payment of fringe-benefits and union dues to Plasterer 67 and its

fringe-benefit funds for employees doing work in the jurisdiction.

Bricklayers' and Allied Craftsworkers' Local Union No. 1, International Union of

Bricklayers and Allied Craftsworkers, AFL-CIO ("Bricklayers 1") and Bricklayers 9 were each

named as parties at interest in the complaint.  Neither Bricklayers 1 nor Bricklayers 9 appeared

in these NLRB proceedings.  GEM did participate in the administrative hearing of the NLRB,

but as noted by the Sixth Circuit, because "it did not file exceptions with the Board  from the

ALJ's decision"  it could not challenge the enforcement action before the Sixth Circuit. *Id.*

Indeed GEM conceded "the Board's entitlement to summary enforcement but reserving a right to

challenge the amount of monetary remedies . . . ." *Id.*

ALJ Fine's findings provide a significantly clearer background to this dispute than the

pleadings in the present case do and, unless challenged by either party, this Court can take

judicial notice of these adjudicative facts under Fed. R. Evid. 201.[1]  They are summarized in

Appendix A to this opinion and Appendix A is herein incorporated by reference.  Judicial notice

is taken of the findings of fact in Appendix A, except for the ALJ finding that GEM is bound by

the 2000 ACT agreement and his related finding that GEM's March 12, 2002, letter to Plasterers

67 failed to terminate its collective bargaining agreement with Plasterers 67.  These latter two

issues are in dispute in the present case.  Defendant/Counter Plaintiff GEM contends in this

---

[1] *Lee Distrib. v. NLRB*, 145 F.3d 834, 841 n. 5 (6th Cir. 1998).
"Pursuant to Fed. R. Evid. 201, we have held that it is appropriate to take judicial notice of 'adjudicative facts'  such as agency and judicial decisions, even where those decisions contain disputed statements of fact, as long as we take judicial notice for some purpose other than to take a position on the disputed fact issue. *See, e.g., United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993).  Under Rule 201 (e) either party may challenge any of these asserted adjudicative facts in objections to this opinion.

litigation that its bargaining agreement with Plasterers 67 expired on March 7, 2003.[2]  GEM's submissions do not indicated that any other of the facts in ALJ Fine's decision  – many objectively demonstrated in written documents and by maps – are being contested, though as noted, GEM can still do so in its objections to this opinion.

According to Plasterers 67, GEM  has failed to comply with the NLRB's decision and order by, among other things, failing to pay Plasterers 67's members the wages and fringe benefits to which Plasterers 67's CBA entitles them.  NLRB Compliance proceedings have not been concluded regarding any unpaid wages and fringe-benefit contributions due to Plasterers 67's fringe-benefits funds.

Under Article V of Plasterers 67's CBA, grievances between the employees and GEM are to be submitted to "final and binding" arbitration before the Joint Grievance Board ("JGB").  On May 4, 2004, Plasterers 67 filed a grievance before the JGB against GEM , alleging that GEM violated Plasterers 67's CBA by failing to pay certain back wages and fringe benefits and damages under that CBA.  After holding a hearing on the grievance on May 25, 2004, in which GEM did not participate, the JGB determined that GEM had violated Plasterers 67's CBA, and ordered GEM to remit to Plasterers 67 $342,324.98 for $208,973.19 in unpaid back wages, $117,071.55 in unpaid fringe benefits, and $5,853.38 in liquidated damages and $10,448.66 in interest.

GEM now claims that it declined to participate because (1) Plasterers 67 had already pursued an almost identical claim before the NLRB and (2) Plasterers 67 no longer had any work

---

[2]  It is unclear why this date is asserted because both the 1997 and 2000 ACT agreements had expiration dates of May 31, 2000 and 2003 respectively that could be triggered by proper written notice being given 60-90 days before the expiration date.  In the absence of such notice both agreements automatically renewed for one year unless superceded by a new agreement.

jurisdiction at the GEM work sites because the Plasterers 67's CBA ended on March 7, 2003.

Thus no wages and fringe-benefit contributions could be due after this date.  GEM did not,

however, assert these jurisdictional defenses before the JGB nor seek to have Bricklayers 9

joined as a party to those proceedings.  Nor, as noted in Appendix A, did it attempt to join

Bricklayers 9 in the NLRB proceeding under 10(k).[3]  On June 2, 2004, the JGB sent a letter to

GEM's owner and president, George Moore, demanding payment in compliance with its order

no later than July 2, 2004.  GEM did not comply with the JGB's June 2, 2004, request, and has

yet to pay the ordered award.

## II. Procedural History in this Court

On August 6, 2004, Plasterers 67 filed a single-count complaint in this Court against

GEM under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking

to enforce that decision by the JGB.  Plasterers 67 served GEM with the complaint on or about

August 6, 2004.   After this Court denied GEM's  September 28, 2004, motion to dismiss under

Fed. R. Civ. P  12(h)(2) for failure to join Bricklayers 9 as an indispensable party under Fed. R.

Civ. P. 19 , GEM filed its answer on April 22, 2005, asserting that Plasterers 67's grievance was

---

[3] "10(k)" refers to 29 U.S.C. § 160(k): Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph(4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

As noted in Appendix A, GEM on November 30, 2001, initially wrote the NLRB asking for a 10(k) hearing to resolve a jurisdictional dispute regarding Macomb county –  specifically on 13-Mile Road at I-94 –  where Plasterers 67 and Bricklayers 1 had conflicting CBA's.  Counsel for GEM acknowledged that GEM did not file a formal unfair labor practice charge against Plasters or  pursue a 10(k) complaint. On this site referred to, GEM's president acknowledged at the administrative hearing that he was using Bricklayer 9 workers, and not Bricklayers 1.  Bricklayers 9 had no CBA involving Macomb county at that time.

filed after its 2000 ACT agreement with GEM was terminated, and thus the JGB had no

jurisdiction over GEM when it held its hearings and issued its decision on May 27, 2004.

On May 13, 2005, GEM filed a Third-Party complaint against Bricklayers 9.  GEM

alleges that both labor organizations' CBAs assert jurisdiction over the synthetic plaster

installation work performed in Lapeer and St. Clair counties, where GEM is located, and that if

GEM is required to pay the contested pension contributions to Plasterers 67, then Bricklayers 9

should refund the money GEM paid Bricklayers 9 toward its pension fund, because only one

labor organization can be entitled to collect pension contributions for the work that was done.[4]

Bricklayers 9 alleges that GEM failed to defend itself at the GEM/Plasters 67 arbitration before

the JGB and allowed a default judgment to be entered.

### III.  CURRENT MOTIONS

**Motion 1:   Bricklayers 9's  Motion to Set Aside June 29, 2005 Order** (Dkt. # 19)

The June 29, 2005, order reiterates the April 12, 2005, denial of GEM's motion to

dismiss, which was heard on March 2, 2005, notes the "parties have stipulated on the record to

the joinder of [Bricklayers 9]," and orders that Bricklayers 9 be joined as a third-party defendant

in this action.  The March 2, 2005, docket entry notes that the "PARTIES STIPULATED TO

JOINDER."  Bricklayers 9 argues that GEM got the June 29 stipulated order entered  –  which

was only stipulated to by GEM and Plasterers 67 –  after Bricklayers 9 filed its motion to dismiss

(Motion # 1 above) on June 22, 2005.  It claims that this was an attempt to bypass Bricklayers 9's

motion and negate its argument that Bricklayers 9 was improperly joined.  Bricklayers 9 offers

---

[4] Both CBAs  contained provisions that require employers to make contributions to the labor
organizations' fringe benefit funds based on the number of employee work hours used by the employer.

as proof the fact that GEM had already filed its third-party compliant on May 13, 2005, and Bricklayers 9 had already returned the executed summons on June 13, 2005, and filed its June 22 motion to dismiss.  Thus,  Bricklayers 9 argues that it was not proper for a stipulated order to be entered without notice to Bricklayers 9 that was a party at that point.  Bricklayers 9 further points out that because the motion argued in March was already disposed of in Judge Borman's decision and order of April 12, 2005, the June 29th order had no other purpose.

GEM responds that they were just trying to memorialize what happened on the record in March and that they had no obligation to include Bricklayers 9 because they were not a party to the March proceeding.

**Analysis of Motion 1:**

If the Court accepts the recommendation that the third-party complaint be dismissed under Rule 12(b)(6), striking this prior order is essentially moot and is thus denied.

**Motion 2:** **Bricklayers 9 Motion for Sanctions** (Dkt. # 23)

Bricklayers 9 repeats its allegations in its motions and requests sanctions under 28 U.S.C. § 1927 and Fed. R. Civ. P 11  saying the suit is untimely and frivolous for reasons stated above.

**Analysis of Motion 2:**

The sanctions sought under 28 U.S.C. § 1927[5] are denied because Bricklayers 9 has

---

[5] 28 U.S.C.  §1927 provides that:
    Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

failed to demonstrate that GEM's actions were efforts to extend the proceedings unreasonably or vexatious. Albeit unsuccessful, they appear to be efforts to undo GEM's past failings and avoid having to pay fringe-benefits twice, which is not an unreasonable goal. Its efforts to achieve this goal may be unsuccessful, but that alone does not raise them to the level of 28 U.S.C. § 1927.

The Rule 11 motion was served on GEM June 27, 2005, more than 21 days before filing it in this Court on July 19, 2005, as required by Rule 11(c)(1)(A). Yet, this sanction motion is also denied. While the report and recommendation issued this date rejects the cases cited by GEM for its asserted exception to its CBA arbitration obligation, its claim to be exempt from arbitration in order to attempt to avoid paying fringe-benefits twice was not totally frivolous or without some reasoned basis to extend the reasoning of certain case law to the present situation.

**Motions 3 and 4: GEM's  Motion to Amend Third- Party Complaint and GEM's Motion to Join Parties (PensionFunds)**

GEM seeks to amend its third-party complaint to add a claim for indemnification and breach of CBA against Bricklayers 9 and to add an unjust enrichment claim against the Trustees of Bricklayers 9's Fringe Benefit Fund whom it wishes to add as a party). These two motions will be treated as motions under Fed. R. Civ. P.  14(a) to add two new third-party claims against GEM and a third-party claim against the Trustees of Bricklayers 9's Fringe Benefit Fund.[6]

**Analysis of Motions 3 and 4:**

---

[6] The initial third party claim brought against Bricklayers 9 by GEM was not filed within ten days of the answer and never received a careful review under Rule 14(a). (GEM's Answer was filed April 22, 2005, GEM's Third  Party Complaint was filed May 13, 2005). It is recommended in a separate Report and Recommendation issued this date that this third party complaint against  Bricklayers 9 be dismissed ending Bricklayers 9's party status in this case. Any claims against Bricklayers 9, who were not a party to the original complaint by Plasterers 67, should be reviewed under the standards of Rule 14(a) and not the more lenient amendment standards of  Fed. R. Civ. P. 15(a).

Fed. R. Civ. P. 14(a) provides:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff.

Rule 14 is derived from the common law concept of "vouching to warranty" where a party having his warranty of title challenged by a buyer could "vouch in" his seller who warranted the title to him. Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE, Civil 2d §1441 (West 1990). This method of settling a single interrelated dispute involving "the same transaction or occurrence that forms the basis of the original action" was later expanded to join third parties on claims of a "right of contribution or indemnity, or any other remedy." *Id.* While originally done totally at the discretion of the court when the rule was adopted in 1938 , Rule 14(a) was amended in 1963 to allow it as right within 10 days of the defendant filing its answer. Thereafter, it is again at the Court's discretion. Even if done in the "safe harbor" 10 day period, "[t]he amended rule also gives the court broad power on motion of any party to strike the third-party claim or to order severance or separate trials." *Id.*

> Rule 14 is intended to provide a mechanism for disposing of multiple claims arising from a single set of facts in one action expeditiously and economically.
>
> Furthermore, impleader is available only against persons who are or may be liable to defendant for part or all of plaintiff's claim; it cannot be used as a way of combining all controversies having a common relationship in one action.

*Id.* at § 1442. (footnotes omitted).

As noted in the cases cited therein, Rule 14 is not intended to be used as a means for trying two separate and distinct causes of action in the same proceeding or joining any claim that may happen to have some relationship with the original claim.. It seems that Rule 14 is to be

used when there is a *direct line of liability* alleged between the defendant/third-party plaintiff

and third-party defendant that is triggered by the plaintiff prevailing in whole or in part

against the defendant/third-party plaintiff.

> The Seventh Circuit upheld the district court's denial of the filing of a third-party

complaint under Rule 14(a) because

> > there was no claim that any one of the additional parties would be secondarily
> > liable to [defendants/third part plaintiffs] in the event it was found in the
> > original cause that [defendants/third part plaintiffs] were liable to appellees.
> > That is a plain condition on the face of Rule 14. The rule is not altered merely
> > by the fact that the alleged third-party claim grew out of the same transaction.
> > *Parr v. Great Lakes Express Co.,* 484 F.2d 767 (7th Cir. 1973); *U. S. Fidelity
> > Guaranty Co. v. American State Bank,* 372 F.2d 449 (10th Cir. 1967).

*U. S. General, Inc. v. City of Joliet*, 598 F.2d 1050, 1052 -1053 (7th Cir. 1979) (Footnote
omitted).

> Under Rule 14 of the Federal Rules of Civil Procedure the additional party pension

funds cannot be added as third-party defendants because there was no claim that any one of

the additional parties would be secondarily liable to GEM in the event it was found that this

Court should enforce Plasterers 67 award against GEM.

> Similarly, while GEM makes conclusory allegations that Bricklayers 9 is liable to it if

it is liable to Plasters 67, it asserts no facts supporting this conclusion.  On the

indemnification claim, it cites a sentence from Article I of the Bricklayers 9 CBA: "The

Union will hold the Company harmless and indemnify them for any loss suffered as a result

of the Union representation."  It is beyond dispute that any liability GEM has to Plasterers 67

under its CBA with Plasterers 67 is not a loss "suffered as a result of the [Bricklayers 9]

representation."  Rather, if the arbitration award is enforced it is the result of GEM's CBA

with Plasterers 67, not Bricklayers 9.  While it is true that GEM paid fringe-benefits to

Bricklayers 9's pension funds for work done on GEM's jobs by Bricklayers 9 workers, if this is deemed a "loss" to GEM, it clearly is not the type of "loss" contemplated by the parties in Article I.  Were it such a "loss," then any fringe-benefits paid by GEM to the Bricklayers 9 pension funds – and possibly even the wages paid to Bricklayers 9 workers – for work by Bricklayers 9 members on GEM's work sites could lead to an indemnification claim against Bricklayers 9.  It is a stretch to interpret this language in Article I as Bricklayers 9 agreeing to indemnify GEM for the fringe-benefits it negotiated would be paid to Bricklayers 9 members under the CBA for work done on GEM's projects.

The Breach of Contract claims against Bricklayers 9 for detrimental reliance and unjust enrichment also boarder on being novel to nonexistent under the law.   Yet, this Court need not determine the merits of the these two alleged contract claims nor of the indemnification claim other than to determine that they, like the claim against the Bricklayers 9's pension funds trustees, are not connected nor triggered by a finding of liability by GEM to Plasterers 67, and thus not appropriate for being added under Rule 14.

These claims, if they exist, are unquestionably entangled with a set of facts, evidence and arguments in many ways unrelated to Plasterers 67's claim for enforcement of its arbitration award.  They do not involve a direct line of liability between the GEM and Bricklayers 9 or its pension trustees that is triggered by Plasterers 67 prevailing in whole or part against GEM.  Were this Court to agree to resolve these novel claims of GEM as an appendage to Plasterers 67's original claim this would not be "a mechanism for disposing of

multiple claims arising from a single set of facts in one action expeditiously and economically" as Rule 14 intended.  Here, as in the *Joliet* case, the alleged third-party claims at best grow out of the same transaction as the underlying claim of Plasterers 67 – work done by Bricklayers 9 members at sites over which Plasters 67 also claims jurisdiction.  Yet, as the *Joliet* case made clear, that is not sufficient to meet the standards of Rule 14.  Here the claims involve different parties, a different CBA, a different fringe-benefit fund. Even if they involve the same hours of the same employees at the same job sites as involved in the Plasterers 67's claim, to add these claims to this action would expand, complicate and potentially confuse what is a relatively simple grievance award enforcement action under § 301.  All of the asserted third-party claims do not qualify as the type of claims Rule 14 anticipated to resolve multiple claims "expeditiously and economically."  Accordingly, in the exercise of this Court's discretion, GEM's motion to add these claims and to add the trustees as  parties are denied.

**Motion 5:**      **GEM's Motion to Extend Dates**

In the May 17, 2005, Scheduling Order with discovery cut-off date of September 16, 2005, GEM agreed to stay discovery pending outcome of motion to strike its third-party complaint.  The Court will adjust the scheduling order as it deems appropriate after ruling on the objections to this opinion.

**Motion 6** : **GEM's Motion to Strike Bricklayers 9's Reply Brief** **(Dkt. # 45)**

GEM's moves to strike Bricklayer 9's August 16, 2005, reply brief based on the

13

assertion that Bricklayer 9's brief was filed in violation of Local Rule 7.1 both as to its length and to the time allowed for filing a reply brief to a response.  GEM is correct that Bricklayers 9's reply brief was not in compliance with Local Rule 7.1.  Yet, a portion of the brief dealt with the issue of exhaustion of administrative remedies, which was a substantial area of discussion at the oral arguments.  Indeed, the issue of whether this exhaustion requirement was a part of the prima facie claim or an affirmative defense was the topic of the supplemental briefing allowed at the hearing.  Had Bricklayers 9 known that their reply brief was stricken, it could have addressed this issue in their supplemental briefing or sought leave of court to file a brief on it, which would likely have been allowed.  Accordingly, pages 1- 7 of Bricklayer 9's August 16, 2005, reply brief  are accepted for consideration.  The remainder of the Bricklayers 9's reply brief on the merits is stricken.  This opinion and the report and recommendation issued this date do not address GEM's claims in its proposed amended third-party complaint on the merits.  These are the topics which make up the bulk of the Bricklayer 9's August 16, 2005,  reply brief.  This opinion solely addresses GEM's  newly asserted claims to determine if the claims are the type that are appropriately added by way of a third-party complaint under Rule 14.

**Motion 7: <u>Bricklayers 9's Motion to Strike GEM's 'second' supplemental brief of September 20, 2005</u> (Dkt. # 53)**

Bricklayers 9's motion to strike GEM's Second Supplemental Brief is based on a scheduling order allowing supplemental briefing on limited issues.  GEM was to file a brief on or before September 7, 2005, and Bricklayers 9 was to file a response by September 13,

2005.  This order did not intend additional briefs after that.  GEM's brief of September 20, 2005, was not filed pursuant to a court rule or order of the court, nor did it seek leave of court to accept a further brief.

Nonetheless, the brief was considered.  Its argument that courts should intervene to avoid industrial strife cites cases that are found to be distinguishable.  Those cases involved situations where an arbitration award in favor of union #1 would, if enforced, directly affect the employer's obligations against union #2.  This is not the case here for reasons noted in the report and recommendation issued this date.  Unlike many of the cases cited by GEM, the employer did not get involved in its "conflict" situation from a merger or other legitimate transaction with third-parties other than the unions, where the employer caught in the dilemma "inherited" a CBA with a union and was not involved in the bargaining and signing of that CBA.  Rather, the employer involved here (GEM) was the legal entity contracting with both of the unions which now have conflicting claims.

If GEM was concerned about a long-standing jurisdictional conflict between Plasterers 67 and Bricklayers 9, the time to have sought federal court intervention was when Plasterers 67 sought arbitration against GEM before the JGB on May 4, 2004.[7]  This Court then might have either (1) ordered joint arbitration, or (2)  intervened and resolved the jurisdictional dispute, or (3) terminated the arbitration under the "industrial strife" exceptions

---

[7] This argument assumes, without a formal finding, GEM's assertion that it could not have sought a 10(k) hearing before the NLRB to resolve the jurisdictional conflict because Bricklayers 9 has not committed any unfair labor practice.

to the general rule fostering arbitration, or (4) terminated the arbitration because of no JGB jurisdiction if GEM was correct in its assertion that its CBA with Plasterers 67 had expired. Yet, GEM took no action in this Court, no action before the JGB, and did not pursue any 10(k) action before the NLRB.  Yet, it now seeks to have this Court perform judicial gymnastics in an enforcement action where the legal stage setting and burdens of proof are far different than might have been earlier in the dispute.

Finally, if as GEM contends in its September 20, 2005, brief, its legal claim(s) against Bricklayers 9 and its pension funds are not ripe unless and until this Court orders enforcement of the JGB award in favor of Plasterers 67, GEM can still seek arbitration against Bricklayers 9 for any alleged CBA violation, and if such claims exist, the arbitrator can determine the extent to which there may be authority through Bricklayers 9 to make any adjustments in the Bricklayers 9 pension fund trusts.

In sum, nothing in GEM's September 20, 2005, brief alters this decision's conclusion that Rule 14(a) is not a proper vehicle for GEM to "piggyback" its multiple, different, novel and complicated claims against Bricklayers 9 and its pension funds onto Plasterers 67's simple enforcement action.

**IV. O̲R̲D̲E̲R̲S̲**

For the reasons stated above **IT IS ORDERED** that Third-Party Defendant Bricklayers 9's motions to Set Aside the June 29, 2005 Order (Dkt. # 19), for Sanctions (Dkt. # 23), and to Strike GEM'S Second Supplemental Brief (Dkt. # 53), and Defendant GEM's

16

motions to Amend Third-Party Complaint (Dkt. # 31), to Join Parties (Pension Funds) (Dkt. # 32), to Strike Bricklayers 9's Reply Brief (pages 1-7) (Dkt. # 45) **BE DENIED** and its Motions to Extend Dates (Dkt. # 37), to Strike Bricklayers 9's Reply Brief (pages 8 ff) (Dkt. # 45) **BE GRANTED.**

The Court will issue an amended scheduling order upon review of any objections to this opinion.

Dated: January 9, 2006                                    s/Steven D. Pepe
Ann Arbor, Michigan                               United States Magistrate Judge

Certificate of Service

I hereby certify that a copy of this Order was served upon the attorneys of record by electronic means or U. S. Mail on January 9, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk

17

**Appendix A**

## CHRONOLOGICAL AND FACTUAL BACKGROUND

### From *Gem Management Company, Inc.* 339 NLRB No. 71

On November 1, 2002, Administrative Law Judge Eric M. Fine, made the following findings that were upheld by the NLRB on June 30, 2003, and the Sixth Circuit on August 19, 2004. *Gem Management Company, Inc.* 339 NLRB No. 71 (2003), *N.L.R.B. v. Gem Management Co.* 107 Fed. Apex. 576, 577 (6th Cir. 2004).

**JUNE 1, 1997**

Former Plasterers 67 negotiated a collective-bargaining agreements with the Detroit Association of Wall and Ceiling Contractors that later became known as the Architectural Contractors Association ("ACT") with effective dates of June 1, 1997, through May 31, 2000 (the 1997 ACT agreement). The 1997 ACT agreement contains a union security clause requiring employees who are union members on the effective date of the agreement to remain members as a condition of employment. New employees were required to become union members following the eighth day of their employment as defined in the agreement. The 1997 ACT agreement provides, in pertinent part:

Article IX entitled "Jurisdiction" Section 12. defined "Detroit Trade Area" as:

> The area in which these working rules apply is all of Wayne County and those parts of Macomb and Oakland counties which lie south of Thirteen Mile Road.

**FEBRUARY 9, 1999**

18

George Moore, the president and sole shareholder of GEM, signed an agreement on February 9, 1999, agreeing to be bound to the Michigan Council of Employers' 1997 to 2000 agreement with Bricklayers 9 (the "1997 MCE agreement"). Based on this 1997 MCE agreement, GEM later became bound to Bricklayers 9's agreement with the MCE running from the period of June 22, 2000, to August 1, 2003 (the "2000 MCE agreement").  The 2000 MCE agreement states in Article II, that "[t]his Agreement shall be in effect within the boundaries of the State of Michigan, excluding all the counties in the Upper Peninsula and excluding the counties of Wayne, Oakland, Macomb, and Monroe in the Lower Peninsula. All other Michigan counties are included."

**JUNE 30, 1999**

On June 30, 1999, Plasterers 67 and a representative of  ACT signed off on an amendment to the 1997 ACT Agreement amending Article IX, Section 12 and expanding Plasterers 67's territorial jurisdiction to include:

> The geographic territory governed by this agreement consists of Wayne, Oakland, Lapeer, Macomb and St. Clair Counties." [8]

**OCTOBER 2, 1999**

---

[8] For reasons footnoted below, ALJ Fine found that: (1)  Moore and GEM were never provided a copy of this June 30, 1999 agreement when they signed the Agreement for Non-Association Members  with Plasters 67 on October 2, 1999;  and (2) GEM  was not bound by the June 30, 1999 agreement  because it was a prior amendment to the 1997 ACT Agreement, and Moore only agreed to be bound by subsequent amendments to the 1997 ACT Agreement.

19

In late 1999, a representative of Plasterers 67 met with some of GEM's employees at one of its job sites, and thereafter called GEM's president Moore informing him that GEM would have to enter into an agreement with Plasterers 67 in order to work in the area.[9]  On October 2, 1999, Moore, on behalf of GEM, signed, via facsimiles copies, an "AGREEMENT FOR NON-ASSOCIATION MEMBERS" with Plasterers 67.  This was a "me too" agreement noting:

> This is to certify that I have read the Agreement between the Detroit Association of Wall and Ceiling Contractors and Plasterers' Local Union No. 67 and I agree to be bound by all provisions contained in this Agreement and any changes that may be made in the future by mutual consent of said parties for the life of this Agreement and any successor agreements.

This language adopts by reference the 1997 ACT agreement making Plasterers 67 the exclusive collective bargaining representative in the jurisdiction  for the period of June 1, 1997, through May 31, 2000.  Plasterers 67 does not operate an exclusive hiring hall.  Rather, signatory employers can call Plasterers 67 for referrals of employees, or they can hire employees off the street, who are required to become union members under the collective-

---

[9] Moore testified before the ALJ that in October 1999, the representative of  Plasterers 67 told him that its jurisdiction was Wayne, Macomb, Oakland, and Monroe counties south of 13 Mile Road and that Bricklayers 1 has jurisdiction with GEM north of 13 Mile Road.  ALJ Fine discounted Moore's testimony as incorrect for two reasons.  First, Plasterers had signed a June 1999 amendment to the 1997 ACT agreement expanding its jurisdiction to all of Oakland, Macomb and Monroe – not just south of 13 Mile Road as Moore contends. Thus, its representative in the fall of 1999 would not limit Plasterers 67's jurisdiction to areas "south of 13 Mile Road ."  Second, in October 1999 GEM did not have a contract with Bricklayers 1 and thus there was no basis for a Plasterers' representative to assert that Bricklayers 1's jurisdiction was  north of 13 Mile Road.  Additionally, when GEM did agree to a CBA with Bricklayers 1 on June 2, 2000,  that CBA's territory for Bricklayers 1 was for all of  "Wayne, Oakland, Macomb, and Monroe Counties" and not just north of Thirteen Mile Road.

20

bargaining agreement's union security provision.

While Moore did not originally receive a copy of the 1997 ACT agreement as he acknowledged, he admits receiving it four months later.  The original 1997 ACT agreement limited jurisdiction in Macomb and Oakland counties to areas "south of Thirteen Mile Road."  While the June 1999 amendment expanded jurisdiction to all of Macomb and Oakland county as well as Lapeer county, the ALJ and NLRB did not bind GEM to this amendment because it was a "past" not a "future" amendment to the CBA Moore finally received.  Plasterers 67 did not demonstrate that Moore received the June 1999 amendment.  Yet, Moore and GEM did agree to be bound to subsequent agreements.

**MAY 31, 2000**

On May 31, 2000, Plasterers 67 entered a new collective-bargaining agreement (the 2000 ACT agreement). The 2000 ACT agreement has a June 1, 2000, effective date and a May 31, 2003, expiration date.  The 2000 ACT agreement reiterated the June 30, 1999, jurisdictional amendment, and provides that:

> "The geographic territory governed by this agreement consists of Wayne, Oakland, Lapeer, Macomb and St. Clair Counties."

**JUNE 2, 2000**

The 1997 ACT agreement, even in its unamended form, gave Plasterers 67 jurisdiction "in those parts of Macomb and Oakland counties which lie south of Thirteen Mile Road."   The 2000 ACT agreement, effective  June 1, 2000, included all of Oakland and Macomb counties in the jurisdiction of Plasterers 67.  Yet, on  June 2, 2000, after George

21

Moore admitted having received a copy of the 1997 ACT agreement, GEM entered into a contract containing a union security clause  with Bricklayers 1, "for all persons employed performing plasterers' work: ... on all present [and] future job sites within the geographic area of Wayne, Oakland, Macomb, and Monroe Counties" (the "Bricklayers 1 CBA").   Under the Bricklayers 1 CBA, the employer agrees that any dispute concerning its obligation to recognize Bricklayers 1 as sole and exclusive bargaining representative will be resolved solely under Article XIV (Grievances), and the employer also expressly waives any right to abrogate or repudiate this agreement during it effective term or to seek a National Labor Relations Board election during the term of this Agreement.

Part of Plasterers 67's complaint before the NLRB was that GEM applied the Bricklayers 1 CBA to Plasterers 67's unit work and is paying the benefits provided for in Bricklayers 1 CBA.  Plasterers 67 also complained that GEM hired Bricklayers 9 plasterers, paid them wages below those in the ACT agreements with Plasterers 67, paid fringe-benefits to Bricklayers 9 benefit funds, and steered new hires to be signed up as Bricklayers 9 union members.

**NOVEMBER 2000**

In November 2000, Plasterers 67 and GEM signed off on an amendment to the 2000 ACT agreement. The amendment, has an effective date of November 21, 2000, and again changed Article IX, Section 12, to read as follows:

Section 12. Territorial Coverage of the Agreement

The geographic territory governed by this Collective Bargaining Agreement consists of Wayne, Oakland, Lapeer, Macomb, St.

22

Clair, Washtenaw, Sanilac and Livingston Counties excluding in
Livingston County the townships of Conway, Cohoctah, Deerfield,
Handy, Hartland, Osceola, Tyrone, Howell and the City of Howell.

As noted above the 1997 ACT agreement had a May 31, 2000, expiration date and
the 2000 ACT agreement had a May 31, 2003, expiration date. Article VIII of the 1997
ACT agreement and of the 2000 ACT agreement, entitled "Term of Contract," had an
automatic renewal provision from year to year "unless notice of change is given not less
than sixty (60) days nor more than ninety (90) prior to the date of such expiration of this
Agreement, by either party to the other." Thus, the windows for termination were in March
2000 or any subsequent renewal year for the 1997 ACT agreement, and in March of 2003,
or any subsequent renewal year for the 2000 ACT agreement. The ALJ noted that
"Respondent [GEM] acknowledge that the provisions of Article VIII govern termination of
those agreements" although there appears to be some disagreement as to which ACT
agreement is operative.

GEM's president, Moore, wrote Plasterers 67's representative on June 25, 2001,
noting: "Attention Local 67: As of June 25, 2001, GEM Management no longer wishes to
have an agreement with your local." On July 20, 2001, Plasterers 67 responded that
"According to the termination language in the Collective Bargaining Agreement we did not
receive your letter in a timely fashion. Therefore GEM Management is still bound by the agreement."

Again on March 12, 2002, Moore signed off on a detailed letter to Plasterers 67,
drafted by his then lawyer Thomas H. Weiss, notifying the union that GEM was terminating

its contractual relationship with Plasterers 67 under the 1997 ACT agreement.  The letter

asserted that GEM was not bound by the 2000 ACT agreement and therefore it was providing

timely notice of termination under Article VIII of the 1997 ACT agreement, which GEM

claimed had been automatically renewed on an annual basis.  In a March 14, 2002, response

Plasterers 67 stated its position that the attempted termination was untimely because,

pursuant to the non-association employer agreement Moore had signed, Respondent was

bound by the 2000 ACT agreement.

        For reasons stated by the ALJ, and adopted by the NLRB, it was determined that

GEM  was bound by the 2000 ACT agreement as a "successor agreement[]" to the 1997 ACT

agreement, but not by the June 1999 amendment to the 1997 Act agreement nor by the

November 2000 amendment to this successor agreement.  The ALJ also determined that both

of GEM's termination letters were ineffective in terminating the collective bargaining

agreement which he found continued to the time of his November 1, 2002, decision.[10]

_____

[10]  In *GEM Management Company, Inc.,* 339 NLRB No. 71 (2003), the NLRB adopted ALJ Fine's
findings and his justifications in footnote 19:

> I therefore find that, by the terms of the nonassociation member agreement Moore signed
> in October 1999, Respondent was bound to the 1997 Act agreement and then became
> bound to the successor 2000 ACT agreement negotiated between Plasterers 67 and ACT.
> Since both Plasterers 67 and Respondent acknowledge that the provisions of Article VIII
> govern termination of those agreements, I find that Respondent's June 25, 2001, and
> March 12, 2002, letters did not constitute timely notice of termination of either of those
> agreements. [FN19]
>
> _____
>
> [FN19] I do not, however, find that Respondent was bound by the June 30, 1999,
> amendment to the 1997 ACT agreement or to the November 2000 amendment to the
> 2000 ACT agreement. The "me too" agreement Moore signed on October 2, 1999,
> certified that Moore had read the master labor agreement then in effect, and he agreed
> that Respondent was to be bound to "any changes that may be made in the future by

Plasterers 67 alleged that since October 2, 1999, it has been the exclusive collective-bargaining representative of the employees at certain job sites in Lapeer and Macomb counties (among others) and that GEM used Bricklayers 9 workers at those sites and failed to apply the 1997 ACT agreement as amended for all the bargaining unit work, and failed to pay benefits required by the agreement to Plasterers 67 and to the bargaining unit employees. It is also asserted that GEM paid money to the Bricklayers 9 funds to cover fringe benefits for employees covered by GEM's agreement with Plasterers 67. It is alleged that by this conduct, and GEM's steering newly hired workers to Plasterers 67, rendered unlawful assistance to labor organizations in violation of Section 8(a)(1) and (2) of the National Labor Relations Act. National Labor Relations Act ("the NLRA"), 29 U.S.C. § 151, *et seq.* Much of what Plasterers 67 asserted was acknowledged by GEM at the June 5, 2002, ALJ hearing, except it argued that Plasterers 67 did not have jurisdiction in Lapeer county under the pre-amended 1997 ACT agreement, which it contends is applicable.[11]

---

mutual consent of said parties for the life of this Agreement and any successor agreements negotiated by them." Since Moore had only agreed to bind Respondent to future changes in the 1997 ACT agreement, Respondent was not bound to the June 30, 1999, amendment which was negotiated in the past. For similar reasons, although I find that Respondent is bound by the successor 2000 ACT agreement, the "me too" agreement Moore signed did not provide that Respondent would be bound by any amendments to the successor agreement. Accordingly, I do not find that Respondent is bound to the November 21, 2000, amendment to the 2000 ACT agreement. In this regard, the Board has demonstrated it will strictly construe "me too" agreements and limit them to the precise terms of what a party has actually agreed to. See, Oklahoma Fixture Co., 333 NLRB 804, 807808 (2001).

[11] In early June 2001, a representative of Plasterers 67 came across a GEM job site at Lapeer Vocational Technical School in Lapeer County. The plasterers on the job told Van Allen they were not being paid Plasterers 67's contract rates.    At the June 5, 2002, ALJ hearing, George Moore testified that

25

Prior to the June 5, 2002, ALJ hearing On November 30, 2001, attorney Thomas Weiss wrote the NLRB Region 7 investigator asserting that Plasterers 67 committed unfair labor practices in violation of Section 8(b)(4)(D) of the Act and requests a 10(k) hearing to determine the work jurisdiction of Plasterers 67 and Bricklayers 1. Weiss states in the letter that:

> 2. GEM is a signatory and party to agreements with two labor unions which assert jurisdiction in Macomb County, Michigan:
> A. Local #67 of the Operative Plasterers; and

---

he was aware that Plasterers 67 asserted jurisdiction over this project but noted that the Lapeer County job was outside of Plasterers 67's jurisdiction as defined in the pre-amended 1997 ACT contract.

In August of 2001, GEM was doing work at an Extended Stay America Hotel ("Extended Stay") located just south of 13 Mile Road in Macomb County. Plasterers 67's representative met GEM's attorney, Thomas Weiss at the job site around October 14, 2001 because Bricklayers 9 members were performing work at the site. Bricklayers 1's June 2, 2000 CBA covered Macomb but Bricklayers 9 CBA did not. At the June 5, 2002, hearing George Moore admitted that the Extended Stay job site was south of 13 Mile Road and that it was within Plasterers 67's jurisdiction even under the preamended 1997 ACT agreement. Moore testified further that Bricklayers 9 is the primary supplier of his company's plasterers and that all of GEM's employees performing plasterer's work at the Extended Stay job site save one were assigned to Bricklayers 9, even though the project was not in Bricklayers 9's jurisdiction. Three were Bricklayers 9 members transferred from another of GEM's locations, five or six employees were hired off the street and then signed up by Bricklayers 9, one was a Plasterers 67 member (who received its pay and benefits). Mr Moore acknowledged that all of these GEM employees were performing plasterer's work at the Extended Stay site. Moore notified Bricklayers 9 about these employees so that they could sign them up. Moore testified that members of Bricklayers 9 performing work on this job had their fringe benefits paid to funds under that union's contract.

Mr. Moore explained that he had Bricklayers 9 sign up the new employees at the Extended Stay job site because that union works in GEM's area, and if Plasterers 67 signed these employees up they would not have transferred to GEM's areas further north when the Extended Stay project was finished because they would have received lower wages when they transferred. Moore testified that Plasterers 67's contractual wages are about $2 to $3 an hour higher than that of Bricklayers 9. Mr. Moore acknowledged that he was not aware of any agreement between Bricklayers 1 and Bricklayers 9 where GEM could use Bricklayers 9 members in an area covered by Bricklayers 1's CBA. Regarding the Extended Stay job site in 2001, even though the June 2, 2000, Bricklayers 1 CBA included Macomb County which was also covered by the 2000 ACT agreement. ALJ Fine quotes Mr. Moore acknowledging that at the time he believed the job site was in Plasterers 67's jurisdiction, and not in either Bricklayers 1 or Bricklayers 9 's CBAs.

B. Local #1 of Michigan, Bricklayers and Allied Craftsworkers
International Union of North America, AFL-CIO.

4. GEM utilized plasterers at a job located in Macomb County,
Michigan, specifically on 13-Mile Road at I-94;

5. GEM depended and relied upon both Local #67 and Local
#1 to provide those plasterers;

6. It is the employer's, GEM's preference that employees
represented by Local 1 perform the disputed work, in
accordance with GEM's previous assignment;

Yet, at the hearing, attorney Weiss acknowledged that no 10(k) complaint was ever

formally filed or pursued.[12]    ALJ Fine found that GEM violated Section 8(a)(1) and (2) of

the Act by unlawfully assisting Bricklayers 9, by violating its contract with Plasterers 67 and

---

[12]  The ALJ reported the following exchange at the June 5, 2002, hearing, when the November 30,
2001, letter was introduced into evidence:

JUDGE FINE: Was an unfair labor practice Charge ever filed?
MR. WEISS: That is the only document that was filed with the Court.
JUDGE FINE: For the Board or the Region?
MR. WEISS: With the Region. I am sorry. With the Region and--
JUDGE FINE: You had already filled out a Charge form and filed it with the Region.
MR. WEISS: I was dissuaded from doing so because the explanation that was given to
me is that this matter was inappropriate for the Charge being made and the 10-K Hearing
request.
JUDGE FINE: All right but you never took it on your own initiative after that to file a
Charge.
MR. WEISS: I was relying upon the statement of the investigator.
JUDGE FINE: But you did not file a Charge?
MR. WEISS: We simply filed that letter.
JUDGE FINE: Right.
MR. WEISS: There is no separate Charge form filed.
JUDGE FINE: Right. Okay. So, there was never any investigation on the 10-K.
MR. WEISS: That is correct, Your Honor.
JUDGE FINE: By the Region.

27

notifying Bricklayers 9 of the ESA site in order for that union to sign up new hires, and by paying fringe benefits to Bricklayers 9's contractual funds when Respondent admittedly had no collective bargaining agreement with Bricklayers 9 that covered the work performed at the ESA job site. Yet, the ALJ determined that he did not need to decide the effect of GEM's contracts with other related unions – Bricklayers 1 and 9 – because: (1) these contracts covered different geographical territories, not all of which are in conflict; (2) despite GEMs claim to the contrary, it had actual or constructive knowledge even prior to Plasterers 67's amendments that Plasterers 67's geographical area conflicted to some extent with that of Bricklayers 1 and 9; and (3) to the extent that the geographical areas of the unions overlap GEM was free to file 8(b)(4) charges in the future and request a 10(k) hearing.

28